## STATE *vs.* MATHEW BARON.

JULY 22, 1940.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

FLYNN, C. J. This is an indictment charging the defendant with manslaughter in connection with the death of his wife. It was tried to a jury in the superior court and resulted in a verdict of guilty. Thereafter the trial justice denied the defendant's motion for a new trial, and the case is before us upon the defendant's bill of exceptions to that ruling and to other rulings made during the course of the trial.

The bill of exceptions contains forty separate exceptions but twenty-eight of these are expressly waived. The remaining ones may be grouped as exceptions: (1) To rulings allowing the state's introduction of certain evidence ·over defendant's objection; (2) to rulings sustaining the state's objection to questions asked by the defendant in direct and cross-examination of witnesses; and (3) to the ruling denying the defendant's motion for a new trial.

In view of our ultimate conclusion, any detailed discussion as to the evidence is neither desirable nor necessary at this time. Suffice it to state generally, in order to understand the defendant's exceptions, certain facts in evidence, without intending to indicate that they are all the facts or to express our opinion as to the value thereof. There was evidence to show that the defendant's wife, aged sixty-seven, with whom he had been living for twenty-five years, was found dead in her tenement on the second floor of a house in Woonsocket on February 4, 1939. She and her husband were seen in that tenement by two neighbors about two o'clock on that afternoon. They had been drinking liquor and wine during the afternoon and had drinks with these neighbors.

The wife was later discovered dead in the parlor of her home by the defendant, about 7 o'clock, p. m., when he awoke, as he testified, after having been asleep with his head on the kitchen table for an indefinite time. The deceased then was in a sitting position on the floor near a wing chair with her head resting on the seat. The defendant testified that he had lifted her to the chair, but was unable to carry her to the bed; and being afraid that she would slide off the chair, he put her back on the floor where she was, and then summoned assistance from other tenants on the first floor of the house.

The deceased, as found by them, was sitting on the floor with her head resting on the cushion of the chair; and they carried her to a bed in another room and notified the police, who in turn summoned the medical examiner. There was no eyewitness to the cause of her death, and apparently no evidence concerning any unusual noise, scuffle, quarrel, or disarrangement of any furniture. There was some evidence of moisture on the deceased's hair, face and her pillow, from which the state contended the defendant had cleaned up evidences of the blood before the police came.

The medical examiner arrived about 7:30 o'clock, made his investigation, later performed an autopsy, and filed his report to the effect that Julia Baron, the deceased, had met her death from an extensive brain hemorrhage caused by outside force, namely, from a blow of a human fist or some other blunt instrument. There was evidence that the defendant was very drunk and more or less incoherent about things happening at the time of, and immediately preceding, the arrival of the police and medical examiner; that a slight or moderate swelling over the knuckles of his right hand was then noted; and that some blood appeared on the fingers of that hand, for which he gave his own explanation in testimony.

The autopsy revealed that the deceased's eye was blackened and swollen; and showed severe injuries to the left side of her face, chiefly a fractured cheekbone, indicating the application of considerable outside force. It was apparently not denied that such force, if applied by a fist, would ordinarily have caused a larger swelling than was present on defendant's hand. The defendant testified that the swelling on his right knuckles was a natural result of his work as a mulespinner and that such swelling was usual with those so engaged.

There was also evidence that a child of the deceased had been for many years an inmate of a Massachusetts hospital because of some type of paralysis; and there was further evidence from certain of the state's witnesses and those of the defense that the deceased had been afflicted with epilepsy for years and was subject to fainting spells or fits; and that she constantly feared death, according to her own statements and letters in evidence, from her epileptic condition or from injuries that she might receive in a fall downstairs or otherwise when overcome by a fit or spell.

The autopsy disclosed, in addition to injuries to the left side of deceased's face, eye and cheekbone, the presence of

much alcohol in her brain cells, as well as an extensive hemorrhage and free blood in the brain; and indicated some bleeding from the nostrils and the corner of her mouth. There was some evidence also, which was disputed, as to previous injuries inflicted upon the deceased several years previously by the defendant. His conviction in 1911 for breaking and entering was admitted. There were other facts in evidence, important to the case, but the above are sufficient to understand the nature of those exceptions which we shall consider.

The fifth exception was to the court's ruling sustaining the state's objection to a question in the cross-examination of Dr. Edward L. Myers, medical examiner, as follows: "And if you did make use of that (meaning a previous medical history of deceased which the witness testified he had obtained), what was it that you were told that you took into consideration in coming to your finding?" The medical examiner had testified substantially to the fact that he had obtained from the daughter of the deceased a previous medical history of the latter and that he had considered such information was "negative", so far as his findings, report, and testimony were concerned. The defendant considered it extremely important to find out what investigation of the previous medical history was made by the medical examiner; how much of that history, if any, he made use of in coming to his conclusions; and what facts therein were actually used by him as a basis for his finding and testimony that such medical history was negative and had no bearing on the death of Julia Baron.

We are of the opinion that the trial justice erred in refusing the defendant's attorney a reasonable latitude to probe the basic facts upon which the medical examiner relied in reaching the conclusions to which he had testified. This is particularly true here because the state's case was premised entirely upon circumstantial evidence; and the weight to be given by the jury to the medical examiner's findings and

conclusions would be measured by the truth of the facts upon which they were based. The court's ruling prevented the defendant's attempt to test the truth of the facts in the deceased's medical history, allegedly relied on by the medical examiner, and the correctness of his conclusions therefrom; and further prevented the defendant's attempt to lay a proper foundation to meet such evidence, if possible, by later testimony of other medical experts. The jury were thus deprived of some evidence that was material to their determination, to be made upon all the evidence, whether the state had excluded all reasonable hypotheses of the alleged death, other than the defendant's guilt as charged. The defendant was thereby prejudiced, and the fifth exception is sustained.

The sixth and seventh exceptions were to the court's rulings sustaining the state's objections to the following questions: "Q. 300. I am talking about injuries to the left side of the face of this deceased woman, but instead of being received from what you think was a fist, were received from some other blunt instrument. Do I understand the finding in that case, the hemorrhage just as you have described it in your autopsy, couldn't occur? Q. 302. The question is this, Doctor. If these injuries to the left side of the face, just as you found them—this is merely an assumption, you understand, it doesn't bind you—If these injuries, just as you found them, had occurred from an epileptic fit with the face hitting against the chair several times, at least a sufficient number of times so that the injuries were just as you found them, that, of course, would cause a cerebral hemorrhage too, wouldn't it?"

The evidence relied on by the state clearly was based upon the theory that the defendant had struck and beaten his wife many times with his fist, causing her severe injuries and resulting in hemorrhages, shock, and later her death; and that at the same time the defendant had thereby caused

the swelling over the knuckles of his right hand and the blood on his fingers and hand. The excluded questions, in our opinion, were reasonable attempts on the part of the defendant to test the reasons which led the medical examiner to testify substantially in support of the state's theory to the exclusion of any other. We are of the opinion that these questions should have been allowed so that the jury would have had all of the facts and reasons by which the medical examiner excluded, in his testimony, all hypotheses of the wife's death, excepting the one alleged against the defendant. Therefore, the sixth and seventh exceptions are sustained.

The fifteenth and sixteenth exceptions relate to the court's ruling sustaining the state's objections, in cross-examination of Helen Tassons, a granddaughter of the deceased, to the following questions: "Q. 202. Did she *say anything* about anything else? Tell us what she thought was going to happen to her? Q. 203. From her condition? Q. 228. That is the house I refer to. What did your grandmother *tell you* about her fear of falling down these stairs in one of these spells?" (italics ours)

All of these questions relate to the same subject-matter. All the medical experts testified that the previous medical history of the deceased was an important factor, to be considered with other facts, in coming to a finding as to the cause of Julia Baron's death. The defense relied strongly on the existence of epilepsy and its effects upon her, in trying to show another possible hypothesis to account for her injuries and death, such as a fall during a fainting spell which caused her head to strike several parts of the chair. Whether this was a *reasonable* hypothesis under all the circumstances in evidence would be, in the first instance, for the jury to decide.

The medical examiner did not agree with other medical authorities and experts upon the effect of excessive alcohol in precipitating epileptic fits, where one has that condition;

and he also denied ever having received from the deceased's daughter a medical history of the deceased's epilepsy. Apparently, the defendant was prepared to show that such a medical history had been given to the medical examiner. In these circumstances, the jury were entitled to consider where the truth was, and also to decide whether the excluded facts, if admitted, would have had a bearing upon any reasonable explanation of the death of Julia Baron other than that to which the medical examiner testified; and also whether the latter, if he had received such history and if it were true, would have altered his finding or testimony. We are of the opinion that the trial justice erred in refusing to permit this evidence, and the fifteenth and sixteenth exceptions are sustained.

There was a further exception, the eighteenth, to the introduction of certain photographs of the deceased. They were taken at the undertaker's about noontime of the day following the discovery of the body. It may be, as the state argues, that these photographs, if otherwise proper, are not inadmissible merely because they might tend to excite some influence beyond their true purpose. See *State* v. *Miller,* 52 R. I. 440. However, photographs under the circumstances here should not be admitted for any purpose unless it has been first established that the physical conditions of the body, at the time when the photograph is taken, were substantially the same as when the deceased's body was discovered, and also that the photograph is a fair representation of those conditions. Our consideration of the transcript leaves a serious question in our minds whether a sufficient preliminary foundation was shown by the state before these photographs were introduced. The testimony to establish such foundation was, at best, very meager and general. Taken into consideration with the other restrictions placed upon the defendant, as previously set forth, we think that the introduction of these photographs, upon such a doubtful preliminary foundation, tended to work an additional preju-

dice to the defendant, and the eighteenth exception is sustained.

The fortieth exception is to the denial of defendant's motion for a new trial. The motion was based upon the usual grounds and upon that of alleged newly discovered evidence. No affidavits of such evidence were filed under the rules and that ground was waived. In considering the exception otherwise, a serious question is raised as to whether the trial justice applied the correct rule in his independent consideration of the verdict as related to the weight of the evidence. We find no reference in the rescript to the requirement of law that the state must prove the charge beyond a reasonable doubt or any finding therein that the evidence was sufficient, in the independent judgment of the trial justice, to establish the charge beyond a reasonable doubt.

This rule is important in every criminal case, of course, and extremely so in one which is based exclusively on circumstantial evidence. The state asks us to assume that the trial justice must have applied the correct rule in considering the verdict on the motion for a new trial. If there were something in the rescript which gave some indication that the trial justice, in passing upon the jury's verdict, was applying the correct rule as he charged the jury, it might be possible to support the state's contention upon this exception. However, there is no such reference. The trial justice did state in his rescript: "It seems to the Court that the jury could fairly reach the conclusion that it did." This leaves us in doubt whether he had in mind the correct rule to apply in a criminal case, because it seems to indicate the rule in civil cases requiring only a fair preponderance of the evidence to support a verdict. This, together with the restriction placed upon the defendant, as previously set forth, in presenting his full defense under the law, leads us to the opinion that justice would be better served in this case, if it

were passed upon by another jury. The fortieth exception is sustained.

For the reasons stated, the fifth, sixth, seventh, fifteenth, sixteenth, eighteenth and fortieth exceptions are sustained. The case is remitted to the superior court for a new trial.

*Louis V. Jackvony,* Attorney General, *Fred A. Otis,* Assistant Attorney General, for State.

*Ira Marcus,* for defendant.