283 A.2d 465.

## STATE *vs.* EARL J. ESPINOSA.

NOVEMBER 10, 1971.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

Powers, J. This is an indictment for murder. The case was tried to a Superior Court justice and a jury which returned a verdict of guilty. It is before us on the defendant's exceptions to the admission of his confession; rulings made in the course of the trial, and to a portion of the trial justice's instructions to the jury.

The circumstances which led to the arrest and indictment of defendant are as follows: On September 2, 1967, one Dorothy Neal, a neighbor, called at the home of Marguerite Wolcott who lived alone at 680 Veterans Memorial Parkway, East Providence. Mrs. Neal was impelled to call at the Wolcott home because Mrs. Wolcott was not answering her telephone.

On arriving at the Wolcott home about 1:10 in the afternoon, Mrs. Neal, getting no response to her knocking, tried the door and found it unlocked. Entering, she found Mrs. Wolcott's body lying on the floor in a pool of blood. She thereupon called the East Providence police.

Sergeant Clifford N. Carr responded and observed signs indicating that the house had been ransacked. His examination of the body indicated that Mrs. Wolcott had been the victim of a violent assault. Consequently a call was made to the office of the medical examiner and Dr. Edwin Vieira went to the scene. He arrived at the Wolcott home at approximately 1:42 in the afternoon and pronounced Mrs. Wolcott dead. Dr. Joseph A. Palumbo, acting chief

medical examiner, was then called, viewed the body and ordered it removed to the state morgue.

There, in the presence of the acting chief medical examiner, an autopsy was performed by Dr. Salvatore R. Allegra, a pathologist. The autopsy findings established contusion of the head and multiple stab wounds or cuts about the neck and throat. These latter were of such an aggravated nature that the head was almost severed from the body.

The principal cause of death was found to be exsanguination, commonly known as loss of blood.

Subsequently, on January 22, 1968, then Captain Eddy of the Providence Police Department, received an anonymous telephone call informing him that the persons who had broken into and entered a Providence cafe the night before could be apprehended on Adelaide Avenue where they were changing a tire on their car which, the informer seemed to know, had been left standing all night.

Acting on this information, Providence police officers went to the indicated location where they found defendant and one Walter Jordan changing the tire. The two men were taken into custody for questioning regarding the break the night before and several other breaks in the neighborhood. It further appears that in the course of being questioned about Providence breaks, defendant volunteered the information that he was involved in a murder in East Providence. It is the version of the Providence police that before defendant made any further statement, he was advised of his Miranda and Escobedo rights and given a form which stated those rights which he voluntarily signed.

Having been thus advised, defendant then gave a statement to the Providence police which was reduced to writing and signed by defendant. In this statement defendant related how he and Walter Jordan were driving around in the latter's car on September 1, 1967, and in their travels

went to East Providence. While there, about one o'clock in the afternoon, they found that the car needed water and they stopped close to the Wolcott house.

They asked for and obtained water from her and then resumed just driving around until they stopped at a bar and "had a couple of drinks." After drinking for about a half hour, they drove back to the Wolcott house where they were admitted by Mrs. Wolcott on their request for a glass of water.

The defendant's statement then recounts how both men hit Mrs. Wolcott on the head with flower pots, jointly attempted to choke her, and how Jordan obtained a knife and cut the victim about the neck. This knife bent and Jordan went to the kitchen whence he returned with a larger knife which he gave to defendant. The defendant then cut Mrs. Wolcott's throat.

In this statement defendant made clear that the return to the house was for the purpose of robbing Mrs. Wolcott. It also makes clear that defendant believed that he inflicted the mortal wound and that Mrs. Wolcott was dead when he left her to search upstairs.

It should be noted parenthetically at or about the same time defendant was giving the foregoing statement to the Providence police Jordan was also making a similar statement. His exact statement as given to the Providence police is not in the record before us. However, from Jordan's testimony at trial which he stated as being the same story as he told to Providence police, it may be taken that their separately signed statements did not differ significantly.

It was defendant's testimony at trial, however, that although Jordan had told him of murdering Mrs. Wolcott, defendant denied being with him.

It then appears that during their interrogation of defendant, the Providence police notified the East Providence

police who, the following day, took defendant into custody for further questioning. According to Captain Hilton of the East Providence police, defendant was again advised of his constitutional rights before questioning and again defendant waived all of them. In substance, defendant in his interrogation by the East Providence police repeated essentially the same story contained in the recorded statement made by him to the Providence police.

Both defendant and Jordan were indicted for the murder of Marguerite Wolcott. Jordan pleaded guilty to a charge of murder in the second degree but defendant elected to stand trial.

In the prosecution of his bill of exceptions before this court defendant made three contentions. The first such contention is made in connection with the exceptions taken to rulings of the trial justice in admitting into evidence state exhibits purporting to establish that defendant had voluntarily and intelligently waived the Miranda and Escobedo rights. It should be noted that included among the state's exhibits to which objection was made and an exception taken was defendant's sworn statement. The thrust of defendant's objection to this evidence at trial was that he agreed to waive his rights and make a statement because of physical coercion.

Before us, however, his challenge to the admissibility of the evidence sought to be suppressed is based not on physical coercion but rather on the proposition that he is so mentally retarded as not to be able to comprehend the meaning of the rights explained to him. Thus, he contends, that by reason of a limited mental capacity he was incapable of an intelligent waiver within the meaning of *Johnson* v. *Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

His contention in this regard rests on oral and documentary psychological and psychiatric evidence adduced

at trial. It is the thrust of such evidence, viewed sympathetically for defendant, that his mental capacity is something between mild retardation and normal. This evaluation rests on a full scale I.Q. score which in the opinion of the testifying clinical psychologists is somewhat misleading in that the full scale score is a composite from testing different abilities in some of which he did better than others.

In any event, before admitting any of the evidence in issue here to which objection was made, the trial justice held a voir dire hearing in the absence of the jury. This consumed some three days during which the state adduced evidence probative of the voluntariness of defendant's waivers and statements while defendant, in addition to testifying to his lack of understanding, as well as police brutality, adduced oral and documentary evidence probative of his contention that the waivers and statements were not voluntarily and intelligently made.

At the conclusion of this hearing, the trial justice discursively stated the reasons why he was convinced that defendant had been fully apprised of his constitutional rights and, clearly understanding them, had nevertheless voluntarily and intelligently waived them all. Flatly rejecting defendant's testimony of physical duress, which rejection was made on the basis of not only credibility but external circumstances as well, the trial justice addressed himself to the issue of intelligence as follows:

> "I listened to the defendant on the stand and he shows ability, in my judgment, to reason and to differentiate, in other words, to take care of himself when he's in trouble. He was very ready with answers, very ready with his answers on the stand in avoiding involvement in admissions of guilt."

Having made this determination, the trial justice recalled the jury and thereafter permitted the state to introduce the evidence which defendant had sought, in effect,

to suppress. In his turn, defendant adduced before the jury the evidence presented by him in the voir dire hearing, which evidence is heretofore related, tended to establish that his waivers and statements were not voluntarily and intelligently made.

Thereafter, in his charge to the jury, the trial justice called their attention to the fact that the question of defendant's guilt rested almost exclusively on statements made by him to both the Providence and East Providence police. He pointed out that with regard to the Providence police, defendant claimed that his admissions were the result of physical duress. He instructed them that if they believed defendant in this regard they could not consider such admissions as evidence against defendant, even though they believed them to be true.

This was so, he instructed, because before such admission could be considered by a jury, they must first find that he had been advised of his constitutional rights, and notwithstanding such rights, voluntarily and intelligently elected to waive them. He further instructed that even if advised of his rights, defendant's admissions must be disregarded if he had made them by reason of either physical coercion or mental deficiencies.

The questioning by East Providence police, as testified to by defendant and East Providence officers, presented a different question which the trial justice recognized and charged accordingly. The officers testified that defendant had been properly warned before questioning and readily signed a waiver of his rights. The defendant admitted having signed the waiver, but denied that he had made the admissions attributed to him in the testimony of the questioning East Providence officers. Thus, the pertinent evidence, not being in conflict in consideration by the jury of the admissions attributed to defendant by the East Providence police officers, was not barred by any question

whether defendant had been properly warned or subject to coercion.

The trial justice recognized this in his instructions but charged the jury that in the case of the testimony of the Providence police, there was the question of whether defendant's waiver of his rights had been intelligently waived. If found by the jury to have not been so made, it was their duty, the trial justice instructed, to disregard his alleged admissions.

We are of the opinion that the challenged evidence was properly submitted to the jury for their consideration. In *State* v. *Leavitt*, 103 R. I. 273, 237 A.2d 309 (1968) we held before allegedly tainted evidence could be considered by the jury, the trial justice was required to honor two procedural safeguards.

First, he must conduct a hearing in the absence of the jury for the purpose of making a preliminary determination as to whether the proffered evidence had been obtained in violation of defendant's constitutional protections against self-incrimination. Moreover, he must find such evidence to be inadmissible and keep the jury from ever hearing it unless by reason of clear and convincing evidence, he is satisfied that the evidence sought to be excluded was not illegally obtained.

Secondly, assuming that he permits the evidence to be introduced as a consequence of his preliminary findings, the trial justice must specifically instruct the jury that before they can consider such evidence they must first determine for themselves that the evidence in question was not obtained in violation of defendant's constitutional protections. Such instructions, moreover, must make clear to the jury that the challenged evidence is to be disregarded by them if they have any reasonable doubt as to its constitutional legality.

We further held in *Leavitt* that if alleged constitutionally tainted evidence is in issue on review in this court, we will look to see whether the trial justice complied with the procedural safeguards heretofore discussed. It appearing that he so complied, this court will then examine the record of the voir dire hearing to determine whether from the evidence adduced thereat, and viewed most favorably to the state, this court could say that the trial justice's decision was clearly erroneous. If found not to be clearly erroneous, the trial justice's decision on the voir dire hearing is dispositive of the contention that defendant's conviction was constitutionally tainted.

In the case at bar, we find that the trial justice did comply with the procedural safeguards approved in *Leavitt*. We further find that from our independent examination of the evidence relied on by the trial justice in admitting the challenged evidence, this court is not left with a definite and firm conviction that a mistake has been committed.[1]

As heretofore stated, the trial justice, in weighing the evidence on the question of whether defendant had been physically coerced by the Providence police, found defendant's assertions in this regard lacked credibility. He made this finding not merely by refusing to believe defendant. Rather, he pointed to the undisputed fact that on January 24, 1968, defendant was examined at the Adult Correctional Institutions by a male nurse who found no evidence that would indicate that defendant had been recently

---

[1]In *Leavitt* we applied the not clearly erroneous rule, citing for authority *United States* v. *Page,* 302 F.2d 81 (9th Cir. 1962) which in turn relied on *United States* v. *United States Gypsum Co.,* 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Later, in 1965, the not clearly erroneous rule was followed in *Wren* v. *United States,* 352 F.2d 617 (10th Cir. 1965), *cert. denied,* 384 U.S. 944, 86 S.Ct. 1469, 16 L.Ed.2d 542 (1966).

More recently, *Page* and *Wren* were cited with approval in *Haire* v. *Sarver,* 437 F.2d 1262 (8th Cir. 1971).

beaten. This was a highly improbable circumstance if defendant's story were to be believed.

The defendant was also examined at the Adult Correctional Institutions on January 25 by Dr. Burtad R. Baronian who also found no evidence of abrasions or contusions. In connection with these medical examinations at the Adult Correctional Institutions, it is probative of defendant's lack of credibility that he made no complaint to either the male nurse or Dr. Baronian of having been beaten by the Providence police.

As to the question of whether defendant had the mental capacity to make an intelligent waiver, we have earlier in this opinion quoted the trial justice's comment on this phase of defendant's contention. The record discloses that the psychological and psychiatric evidence on which defendant heavily relies is not unequivocal. Thus it is but one factor in determining defendant's ability to comprehend. *People* v. *Lux,* 34 App. Div.2d 662, 310 N.Y.S.2d 416 (1970). There, on the basis of an I.Q. score substantially comparable to that of the instant defendant, Lux qualified in the dull normal or borderline range of intelligence. However, the New York court held that Lux's entire background, as the same was revealed at trial, was a factor to be weighed along with the I.Q. score in determining whether he was capable of making an intelligent waiver.

On scrupulous consideration of the entire record, including defendant's response to the intricacies of trial, we think there is ample evidence to conclude that the state met its burden of proof by clear and convincing evidence, and the trial justice was not clearly erroneous.

It is our judgment, therefore, that defendant's exceptions to the admissibility of the waiver statements and admissions attributed to him in his signed statement, as well as those testified to by the Providence and East Providence

police officers are without merit, and these exceptions are overruled. *State* v. *Leavitt, supra.*[2]

We turn next to a consideration of the exceptions encompassed by defendant's contention that it was prejudicial error for the trial justice to admit the testimony of Walter Jordan into evidence.

As heretofore related Jordan had been indicted along with defendant for the murder of Mrs. Wolcott. Jordan had elected, however, to plead to second degree murder rather than stand trial. It should be further noted that Jordan had also been indicted for robbery in connection with the murder. This indictment was nol prossed by the state.

Thus, all charges against Jordan having been disposed of, he was called in rebuttal of defendant who had denied being implicated in the murder of Mrs. Wolcott.

Counsel for Jordan, however, informed the trial justice that he had advised his client, in substance, that his testimony might lay Jordan open to a charge of conspiracy to murder, in which case, Jordan, if compelled to testify, should plead the fifth amendment. He also informed the court that if it were the trial justice's opinion that he could protect Jordan from prosecution of any other charges, and thus compel Jordan to testify on the ground that there could be no self-incrimination, hence recourse to the

---

[2]In applying the procedural dual safeguard rule adopted in *State* v. *Leavitt,* 103 R. I. 273, 237 A.2d 309 (1968), to the case at bar, we are not unmindful that the evidence sought to be suppressed in *Leavitt* was challenged on the ground that it was the fruit of an unlawful search in violation of *Leavitt's* fourth amendment right. Whereas the instant defendant alleged a violation of his fifth amendment right against self-incrimination, the root issue in both cases, however, is whether there had been a knowing and intelligent waiver of the respective constitutional guarantees. We perceive no logical reason to distinguish between constitutional safeguards, when the true question involved is whether there has been a valid waiver of the particular guarantee invoked.

fifth amendment, Jordan would testify but only because he was ordered to do so.

It being the trial justice's opinion that he could protect Jordan he so ruled and ordered Jordan to testify. Counsel for defendant thereupon objected to Jordan testifying and seasonably excepted and this objection was overruled.

At the outset, it should be made clear that we do not concern ourselves whether the trial justice had jurisdiction to grant Jordan immunity from prosecution of any other charge based on Jordan's compelled testimony. The sole question for our consideration is whether, assuming that the trial justice could not compel Jordan to testify and his order to do so was prejudicial to Jordan, defendant has any standing to object. We think not. In *Bruton* v. *United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), relied on by defendant, it was held to be a violation of Bruton's sixth amendment right of confrontation to admit into evidence the signed confession of a co-defendant. In the case at bar, however, the evil of non-confrontation is not present. Jordan testified in the presence of defendant who cross-examined him. In such circumstances, we hold that assuming that the trial justice's order compelling Jordan to testify was prejudicial, the error is personal to Jordan and not grounds for a meritorious exception by defendant. For an exhaustive discussion of the soundness of this rule see *Bowman* v. *United States,* 350 F.2d 913 (9th Cir. 1965), which does not appear to have ever been repudiated. *See also Nelson* v. *O'Neil,* 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971), distinguishing *Bruton* v. *United States, supra.*

The defendant's remaining exception is also without merit and requires no extended discussion. It was taken to the trial justice's instruction to the jury that although the indictment charged that the murder was committed on September 1, 1967, the state was not held to prove that the

murder occurred on that exact date. We had occasion to consider the proposition in *State* v. *Correia,* 106 R. I. 655, 262 A.2d 619 (1970). There, we held that the exact date on which a crime is charged to have been committed need not be proved since the date is not an essential element of the offense charged unless a statute of limitations is involved.

The defendant's exceptions are overruled, and the case is remitted to the Superior Court for further proceedings.

*Richard J. Israel,* Attorney General, *Donald P. Ryan,* Asst. Attorney General, for plaintiff.

*James Cardono,* Public Defender, *Moses Kando,* Asst. Public Defender, for defendant.