*120 OPINION OF THE COURT
Fuchsberg, J.
At about 2:00 a.m. on August 9, 1975, Edgar Bronfman received a telephone call from his 22-year-old son, Samuel, advising him that he had been kidnapped at gunpoint, that he was in fear of his life and that his captors would shortly communicate their demands. The week ahead bore witness to a series of sensational events that first led to the successful transfer of a 2.3 million dollar ransom and eventually culminated in the rescue of young Bronfman and the arrest of Mel Patrick Lynch and Dominick Byrne, both of whom were ultimately found guilty of grand larceny in the first degree.
Lynch’s appeal from his sentence and Byrne’s from his judgment of conviction have since been affirmed by the Appellate Division. On Byrne’s further appeal to this court, the primary issue is whether it was error for the Trial Judge to have allowed certain oral statements taken from this defendant to be received in evidence when the FBI agents who took them subsequently violated the defendant’s constitutional right to counsel. He also argues that the statements should have been suppressed because his interrogators did not interrupt their questioning to accommodate his request that he be permitted to visit a church. We conclude that both contentions are without merit.
The defendants were apprehended shortly after midnight on Sunday, August 17, after Byrne contacted the New York City police and related a remarkable tale, which, in essence, described how he and Lynch had been coerced into participating in the Bronfman kidnapping by several unidentified gunmen. Upon the arrival of the FBI agents, who had undertaken the investigation of the case, he repeated the same story and led them to Lynch and Samuel Bronfman.
Byrne was next taken to FBI headquarters where at 5:14 a.m. the questioning that furnishes the grounds for this appeal began. It is not denied that Byrne was fully advised of his constitutional rights and that no physical or other coercion was ever employed. After again reciting the version of the kidnapping he had already related, at about 6:50 a.m., Byrne repudiated that story and gave the "true” account of the crime. After a number of interruptions, including two for conferences that he was permitted to have with Lynch, he handed the agents the key to the apartment where the money *121 was hidden and then, from 9:00 a.m. until 12:20 p.m., when he was given lunch, he spelled out a day-by-day description of the planning and execution of the kidnapping. Though somewhat more detailed, except to indicate that Byrne and Lynch had acted alone, it did not differ significantly from his original narration.
At about 12:50 p.m. two Assistant United States Attorneys started to query him anew. This interview was still in progress when, at 2:10 p.m., Peter E. De Blasio, the attorney retained by Byrne’s wife, calling from New Hampshire to FBI headquarters, informed the agent in charge that Byrne was his client and requested that the questioning cease. The Government did not respect this advice. Its attorneys continued their ongoing examination until about 2:50 p.m., at which time Byrne signed a statement. The agents thereafter supplemented their own interview too, this culminating in another signed confession at 7:00 p.m.
After a hearing on Byrne’s motion to suppress the fruits of all the questioning, the trial court ruled inadmissible the written statement secured by the Government attorneys at 2:50 p.m. together with all the oral statements elicited preceding its execution from the very time the attorneys had first arrived two hours earlier. It also excluded any statements, written and oral, made to the agents during that interval or thereafter. Thus, at the trial neither written or oral inculpatory statements made after counsel’s 2:10 p.m. telephone call went to the jury (People v Garofolo, 46 NY2d 592; People v Hobson, 39 NY2d 479, 481; People v Gunner, 15 NY2d 226, 232). However, since that left in the oral statements taken by the agents earlier that day, defendant, relying on People v Failla (14 NY2d 178), argues that, once defense counsel had notified the FBI of his representation, continued interrogation vitiated not only so much of his confessions as were thereafter elicited but any prior portions as well.
True, in Failla we held that the part of an ongoing confession that had been taken prior to the entry of a lawyer should have been suppressed along with the portion that had been obtained after counsel had made his presence known. However, since the rule that case pronounced was not handed down in the abstract, we look to its circumstances to discern its holding. There, the defendant’s lawyer presented himself to the police barely two minutes after their questioning of the defendant had started, but deliberately was kept waiting for *122 nearly two hours until it was all over. Thus, the portion of the confession that preceded the exclusion of the lawyer was so insubstantial that it could be said that, as a practical matter, it was as if all of it had followed the violation (cf. People v Garofolo, supra). In this regard, Failla was totally unlike the present case, in which one set of interrogators (the agents) had spent many hours with Byrne and the other (the Assistant United States Attorneys) had done so for almost an hour and a half before the De Blasio call came in.
Obviously inapplicable here is the converse principle — that an invalidly obtained prior confession may require exclusion of a subsequent validly taken one (see People v Valerius, 31 NY2d 51, 55). Simply stated, once the police have illegally caused a defendant to "let the cat out of the bag”, statements he makes afterward, no matter the safeguards the police employ as to these, may be found as a matter of fact to stem from the initial illegality (see, e.g., People v Chapple, 38 NY2d 112, 115; People v Stephen J. B., 23 NY2d 611, 615). However, it is noteworthy that in such cases the taint is prospective only, never retrospective.
Nor is this a case in which statements given prior to the intervention of counsel and ones made afterwards are so inextricably bound together that it is impossible to clearly separate the admissible from the inadmissible content. It is also not one in which for some reason it cannot be ascertained which portions of a statement preceded the overlooking of the right to counsel and which were made subsequent to that abuse. Neither such contingency troubles us here. There are affirmed findings of fact that the statements elicited after 2:10 p.m. were either duplicative or committed to a written form; the writings were excluded. Moreover, in this case contemporaneously recorded notes of the agents and the line of demarcation created by the interview session conducted by the Government attorneys (whose own work product was suppressed), acted as an important check against the potential for vagaries that sometimes characterize oral recollections (see People v Garofolo, supra, p 602).
Finally, we reject out of hand the rather ingenious attempt to equate the agents’ deferment of Byrne’s request that he be taken to church midst his Sunday morning interrogation with the deliberate frustration of access to counsel described in our recent decision in People v Bevilacqua (45 NY2d 508). In *123 Bevilacqua (p 514), we perceived a "seemingly conscious scheme * * * to prevent [an 18-year-old defendant] from establishing contact with anyone who might be able to provide him with assistance or advice”. There, despite the defendant’s repeated request, the police prevented him from notifying his mother of his arrest until after he had confessed. By transporting him to a police station different from the one to which the other perpetrators of the crime had been taken, they frustrated attempts to learn where he was being held. And, to make the cheese more binding, later they concealed his location from his lawyer. The total effect, among other things, was to seriously impair the right to counsel.
None of these elements inhere in the present case. And there is no indication that Byrne’s church request flowed from other than a generalized desire to pray for divine counsel or merely to attend regular Sunday services. Specifically, the record gives no inkling of any intention to seek the aid of a clergyman rather than that of a lawyer as a primary source of help and advice. In any event, the constitutional right to counsel does not metamorphosize into a right to consult clergymen, physicians or others whose capabilities in such situations vary materially from those of members of the Bar.
For all these reasons, the order of the Appellate Division should be affirmed.