STATE

v.

Joseph L. BENTON.

No. 79–153–C.A.

Supreme Court of Rhode Island.

April 15, 1980.

Dennis J. Roberts, II, Atty. Gen., Melanie W. Spencer, Sp. Asst. Atty. Gen., for plaintiff.

John F. Cicilline, Providence, for defendant.

## OPINION

**BEVILACQUA, Chief Justice.**

The defendant, Joseph L. Benton, was charged by indictment of murder (count 1) and assault with intent to murder (count 2). After a trial before a jury in the Superior Court, the defendant was convicted of murder in the first degree on count 1 and assault with a dangerous weapon, a lesser included offense under count 2. The defendant appeals.

During the early evening of September 19, 1977, Arthur E. Pine saw defendant engage Rubin Carmona (Carmona) and Victor Ortiz (Ortiz) on a service road off Notre Dame Avenue, near the Prospect Heights shopping center in Pawtucket, Rhode Island. According to Mr. Pine's testimony at trial, initially there was nothing unusual about this meeting. Uneasy feelings, however, existed between defendant, a heroin user at the time, and Carmona. Carmona, several days earlier, had allegedly used a knife to attack defendant because defendant had failed to pay for heroin acquired

through Carmona. The defendant testified at trial that, fearing further attacks against himself or his family, he now sought to smooth things over with Carmona. Nevertheless, defendant was armed with a chrome-plated 32-caliber Smith and Wesson revolver that he had acquired shortly after Carmona's knife attack. Mr. Pine testified that, sometime after he had turned his attention from the three men, he heard a firecracker-like bang and turned and observed defendant firing a small, chrome gun at Carmona, who was then stumbling down Notre Dame Avenue. Mr. Pine stated that he heard about three shots.

As both Carmona and Ortiz fled from defendant, they came upon Ortiz's brother, Carlos Rubin Ortiz, who coincidentally had been motoring near the shopping area at the time of the shooting. Carlos drove his brother and Carmona to Memorial Hospital in Pawtucket because both were bleeding and covered with blood. En route, Carlos, who had also heard the gun shots, asked Carmona who had shot him, and Carmona replied, "Harold's cousin." Carmona later died, and a September 20, 1977 autopsy indicated that his death resulted from injuries caused by two bullets that had entered his back. The defendant, a short time after the shooting, fled to Houston, Texas, where relatives of his resided.

Before trial, defendant moved to suppress two confessions he had given police, contending that they had been obtained in violation of his rights under the *Miranda* decision. Detectives Richard E. DeLyon and Charles F. Dolan of the Pawtucket Police Department testified at the suppression hearing. Their testimonies revealed that on the morning of March 3, 1978, they met with defendant, who was then being held by the Houston, Texas, Police Department at its Harris County Jail. At this meeting, the officers first identified themselves and then told defendant that they had come to return him to Rhode Island to be arraigned on murder and assault charges. The defendant had earlier waived extradition proceedings. The officers then advised defendant of his *Miranda* rights

and had him read, initial, and sign their department's constitutional-rights notification certificate. The defendant then admitted to the murder of Rubin Carmona and the assault upon Victor Ortiz. He eventually reduced his statements to writing on a waiver-and-statement form provided by the officers. The next day defendant was returned to Rhode Island and confined overnight at the Pawtucket Police Department.

Detectives DeLyon and Dolan further testified that on March 5, 1978, they again spoke with defendant about the September 19, 1977 shooting of Carmona and Ortiz. Once more defendant was advised of his *Miranda* rights and executed a rights-notification certificate prior to any questioning. This time, however, the officers contemporaneously typed out their questions and defendant's responses. The defendant then read and signed the statement.

The defendant's testimony at the suppression hearing contradicted that given by Officers DeLyon and Dolan in two respects. First, the officers had testified that prior to his execution of the rights-notification certificate, defendant had asked them what was meant by his right to be confronted with the witnesses against him. The defendant denied that he had ever made such a request. Second, defendant testified that after executing the certificate in Houston he had requested an opportunity to call his aunt, who resided in the Houston area, and that after executing the certificate in Pawtucket he had requested an opportunity to call his mother. The officers had previously testified that defendant did not request to speak with anyone prior to or during either the Houston or Pawtucket interrogations.

The trial justice, at the conclusion of the suppression hearing, found that neither of defendant's confessions had been obtained in violation of his Fifth Amendment right against self-incrimination. He found that on each occasion defendant was adequately and effectively apprised of his *Miranda* rights and that defendant had executed the Pawtucket Police Department's rights-notification certificate. He further found that there was no credible evidence to suggest

that defendant had invoked his right to remain silent or his right to the assistance of an attorney during questioning. Finally, he found that defendant had voluntarily, knowingly and intelligently waived those rights, even if one assumed that defendant had requested and was denied an opportunity to speak with his aunt or his mother prior to either interrogation. The trial justice then denied defendant's motion to suppress, and the confessions were subsequently introduced in evidence at defendant's trial.

I

The defendant raises several issues alleging error. The first that we shall address is defendant's contention that the trial justice erred in denying defendant's pretrial motion to suppress his Houston and Pawtucket confessions.

The defendant initially argues that his confessions were obtained in violation of his Fifth Amendment right against self-incrimination for the following reasons. First, defendant contends that as "a black with an eighth grade education, [he] could not be expected to fully appreciate the circumstances in which he found himself in either the Harris County Jail or the Pawtucket Police Department." In effect defendant claims that he was not capable of making a knowing and intelligent waiver of his right to remain silent and his right to an attorney as guaranteed by the Fifth Amendment. Secondly, defendant contends that "[h]is request to communicate with both aunt or (sic) mother was his way of saying, 'I wish to remain silent' and 'I wish the assistance of counsel.'" Third, defendant argues that in any event, he did not voluntarily waive those rights. The defendant further argues that any statements he made during the interrogations were coerced and that the confessions were obtained in violation of his Sixth Amendment right to assistance of counsel.

The state in turn argues that defendant did not request to see anyone and that he knowingly, intelligently, and voluntarily waived his rights. The state also asserts

that even if defendant had asked to see his aunt or mother prior to either interrogation, neither his Fifth nor Sixth Amendment rights would have been violated because a suspect who requests to see someone other than a lawyer has not asserted his rights under *Miranda.*

 Under the *Miranda* decision it is well settled that the determination of whether statements made during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation in order to ascertain whether the accused in fact knowingly and voluntarily decided to waive his rights to remain silent and to have the assistance of counsel.[1] *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *State v. Lachapelle,* 112 R.I. 105, 308 A.2d 467 (1973). After the required warnings are given, "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda v. Arizona,* 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724. In any event, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. * * * If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.* at 473–74, 86 S.Ct. at 1627–28, 16 L.Ed.2d at 723.

 It is well settled also that whether a defendant waived his rights voluntarily, knowingly, and intelligently is a question to be decided by the trial justice initially, and the burden is on the state to establish such waiver by clear and convincing evidence. *State v. Leavitt,* 103 R.I. 273, 237 A.2d 309

(1968). However, when a trial justice has ruled that a defendant's statements are admissible, we do not upset the trial justice's ruling on the admissibility of the defendant's confession unless upon an independent examination of the record in the light most favorable to the state, we determine that the trial justice's ruling was "clearly erroneous." *State v. Espinosa,* 109 R.I. 221, 283 A.2d 465 (1971); *State v. Leavitt, supra.*

 From our examination of the evidence adduced at the suppression hearing, we cannot say that the trial justice was clearly wrong in denying defendant's motion to suppress the confessions. The evidence adduced at the suppression hearing indicates that defendant was adequately and effectively apprised of all his rights under the *Miranda* decision. In addition the record contradicts any contention that defendant was unable to understand those rights, the nature of his actions, or the consequences of a waiver of those rights. The defendant was almost twenty-seven years old at the time of the interrogations. He had spent time in military service. He had been informed of the charges against him. Moreover, there is no indication of any special circumstances that support a different conclusion.

We also find, as did the trial justice, that the record fails to reveal "any credible testimony at all that [defendant's] confession[s] [were] a result of duress, threats or promise * * *." Even assuming that defendant requested and was denied an opportunity to speak with his aunt or his mother, there is no evidence that he was being held incommunicado or "[c]onfronted with the express threat of continued incommunicado detention and induced by the promise of communication with and access to family * *." *Haynes v. Washington,* 373 U.S. 503, 514, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513, 521 (1963).

---

1. The totality-of-the-circumstances approach mandates an inquiry into all the circumstances surrounding the interrogation. This inquiry includes evaluation of the accused's age, experience, education, background, and intelligence to determine whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights. *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 2571, 61 L.Ed.2d 197, 212 (1979); *see North Carolina v. Butler,* 441 U.S. 369, 374, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286, 293 (1979).

Finally, we observe that even if defendant had requested to speak with his aunt or mother prior to either interrogation, such requests would not have served to invoke his right to remain silent or his right to counsel. In *Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), the Supreme Court rejected the contention that a juvenile's request to speak with his probation officer served to invoke his *Miranda* rights, stating that "[t]he rule in *Miranda* * * * was based on this Court's perception that the lawyer occupies a critical position in our legal system * * *." *Id.* at 719, 99 S.Ct. at 2568, 61 L.Ed.2d at 208. "And there is nothing inherent in the request for a probation officer that requires us to find that a juvenile's request to see one necessarily constitutes an expression of the juvenile's right to remain silent." *Id.* at 724, 99 S.Ct. at 2571, 61 L.Ed.2d at 211–12. These considerations are even more persuasive in the case before us, where the conduct of an adult is at issue. We therefore think *Fare* is dispositive of this question. *See also People v. Byrne*, 47 N.Y.2d 117, 122–23, 417 N.Y.S.2d 42, 45, 390 N.E.2d 760, 763 (1979); *State v. Franklin*, 103 R.I. 715, 722–23, 241 A.2d 219, 224–25 (1968).

For these same reasons, we also find that defendant waived his Sixth Amendment right to assistance of counsel, which right attached at the time judicial proceedings were instituted against him. *Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424, 436 (1977); *Kirby v. Illinois*, 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411, 417 (1972). Although we are cognizant that a waiver of this right must meet the strict standard of an intentional relinquishment or abandonment of a known right, *Brewer v. Williams*, 430 U.S. at 404, 97 S.Ct. at 1242, 51 L.Ed.2d at 439; *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938), we nonetheless find that defendant voluntarily, knowingly, and intelligently waived this right.

## II

The defendant next argues that Arthur Pine's in-court eyewitness identification should have been excluded because the identification was tainted by constitutionally improper pretrial photographic and one-on-one identifications.

Our rules governing the conduct of trials involving identifications are clear. When a defendant challenges the admissibility of an in-court identification, the court on facts elicited outside the presence of the jury must decide whether a pretrial identification by the same eyewitness violated the defendant's due process rights or right to counsel. If a violation is found, the court should then decide whether the in-court identification is still admissible because it has an independent source. *State v. DeMasi*, 118 R.I. 494, 497–98, 374 A.2d 806, 808–09 (1977); *State v. Ragonesi*, 112 R.I. 340, 344–45 n.4, 309 A.2d 851, 853–54 n.4 (1973), quoting *Clemons v. United States*, 408 F.2d 1230, 1237 (D.C.Cir.1968), *cert. denied*, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969).

In the instant case, consistent with those rules, the trial justice conducted a *voir dire* hearing and ruled that there was a factual basis for Arthur Pine's in-court identification independent of any photographs which he was shown or any one-on-one confrontation which took place.

We do not upset the findings of fact of a trial justice sitting without a jury unless they are clearly erroneous. *State v. DeMasi*, 118 R.I. at 497, 374 A.2d at 808.

At the *voir dire* hearing Mr. Pine testified that he initially had observed defendant, Carmona, and Ortiz for approximately fifteen seconds and that thereafter he had continued to watch them for some time before turning his attention elsewhere. Mr. Pine distinguished each of the three by skin color, height, dress, and hair style. He testified also that he had noticed that defendant apparently wore a cast or bandage on his right arm, the arm allegedly injured in repelling Carmona's knife attack.

The accuracy of Mr. Pine's detailed description of defendant is not disputed. Moreover, the record shows that he had

ample opportunity to observe defendant at the scene of the crime and that he was sufficiently attentive to the activities of defendant prior to and during the firing of the murder weapon to identify defendant as the person doing the shooting. Under these circumstances we cannot say that the trial justice was clearly wrong with respect to his factual finding that Arthur Pine possessed an independent basis for his in-court identification.

## III

■ The defendant next argues that certain testimony of Carlos Rubin Ortiz should have been excluded as hearsay. Carlos was permitted to testify to Carmona's response that "Harold's cousin" had shot him. In response to defendant's objection, the trial justice ruled this testimony admissible under the dying-declaration and the excited-utterance exceptions under the hearsay rule. Either exception, standing alone, is sufficient to circumvent application of the hearsay rule.

■ When a court determines whether a statement qualifies as an excited utterance, the crucial question is whether from a consideration of all the facts the trial justice is satisfied that the declarant was still laboring under the stress of nervous excitement when he spoke. There are no hard and fast rules. The determination must be resolved upon the circumstances of each case and rests in the sound discretion of the trial justice. *State v. Jalete*, R.I., 382 A.2d 526, 529 (1978); *State v. Vaccaro*, 111 R.I. 59, 63, 298 A.2d 788, 790 (1973); *State*

*v. Nordstrom*, 104 R.I. 471, 476, 244 A.2d 837, 840 (1968).

■ Given the circumstances before the trial justice in the instant case, namely, Carmona's life-threatening injuries and Carlos's testimony that Carmona had made his utterance only moments after having been shot and having effected a narrow escape from further peril, we find that the trial justice properly decided that the utterance was " * * * made under the immediate and uncontrolled domination of the senses * * * during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection * * *." 6 Wigmore, *Evidence* § 1747 at 195 (Chadbourn rev. 1976). Our conclusion that the trial justice did not abuse his discretion in admitting the testimony under the excited-utterance exception is dispositive of defendant's third assignment of error.

## IV

■ After Carlos had been permitted to testify to Carmona's response that "Harold's cousin" had shot him, he was eventually permitted to point out defendant as the person he knew as Harold's cousin. The defendant objected at trial and argues here that by this testimony the witness was permitted "to give his opinion of what decedent [Carmona] meant by his answer 'Harold's cousin.'"

An examination of the record of Carlos's testimony establishes that defendant's contention is without merit.[2] Carlos was never

2. The pertinent portion of the direct testimony of Carlos Rubin Ortiz is as follows:

"Q And did you know who he meant when he said that?
A Yes.
Q And who did he mean when he said that?
MR. CICILLINE: Objection.
THE COURT: Establish the reliability of it.
Q How do you know who Harold's cousin is?
MR. CICILLINE: Well, objection. If I may be heard briefly?
THE COURT: Overruled. Exception.
MR. CICILLINE: Could I be heard?
THE COURT: Overruled. Exception, Mr. Cicilline. Overruled.

Q Mr. Ortiz, how do you know who Harold's cousin is?
A I saw him with his cousin Harold all the time, and at the basketball court playing at the—
Q At the where?
A At the Prospect Heights, Prospect Heights—
Q Project?
A Yes. And I recall two or three persons that know him as Harold's cousin. That's how I know that he was Harold's cousin.
Q And how do you know Harold?
A Harold? .
MR. RENALDO: Yes.

permitted to testify to whom he knew Carmona meant by his utterance. Although he did at one point in his testimony identify defendant, the context of his testimony related to whom he knew as "Harold's cousin," not to whom Carmona knew as "Harold's cousin." In fact the trial justice corrected the state's attorney by noting that Carlos had not merely identified defendant but had "identified the defendant that he knew as Harold's cousin." Thus, we dismiss defendant's argument as without basis in fact.

### V

The defendant next argues that the trial justice erred in admitting certain opinion testimony by the state's ballistics expert, Dr. Richard C. Wilkinson. Doctor Wilkinson, an employee of the Laboratories for Scientific Criminal Investigation at the University of Rhode Island, had microscopically compared the barrel striations on a test bullet that he had fired from the alleged murder weapon with those on the two bullets that had caused Carmona's fatal injuries. Doctor Wilkinson testified that "the test is conclusive to the exclusion of any other weapon." He further testified on the basis of his ballistics test that all three bullets "were fired from [the alleged murder weapon] to the exclusion of any other [weapon]."

The defendant first contends that it was error to permit Dr. Wilkinson to state an opinion about the conclusiveness of his test. The defendant alleges that such testimony invades the province of the jury, whose job is to determine the weight to be accorded evidence adduced through the opinion testimony of an expert witness.

In matters beyond the ordinary knowledge of a jury, expert testimony may be admitted to aid in its search for the truth.[3] *State v. Vargus*, 118 R.I. 113, 126, 373 A.2d 150, 156 (1977). Such evidence, however, has no special status, and the jury is free to accept or to reject it, or to accord to the expert's testimony any probative value it deems appropriate. *State v. Vaccaro*, 111 R.I. at 66, 298 A.2d at 792. Moreover, in the course of expert testimony it is common for the witness, implicitly or explicitly, to exclude conclusions other than the one reached by him. For example, in *Vaccaro* the expert was permitted to testify that although the evidence suggested two conclusions, the one not asserted by him "was remote." *Id.* at 66, 298 A.2d at 792. In *State v. Andrews*, 86 R.I. 341, 134 A.2d 425 (1957), the expert testified that the test sample and the sample taken from the victim had "originated from the same source." *Id.* at 345, 134 A.2d at 428. In *State v. Kozukonis*, 100 R.I. 298, 214 A.2d 893 (1965), we described the expert's testimony as "rul[ing] out other possible causes for the symptoms exhibited by defendant." *Id.* at 301, 214 A.2d at 896. And in *State v. Baron*, 65 R.I. 313, 14 A.2d 795 (1940), we similarly described the expert's testimony as excluding all reasonable hypotheses of the victim's death, "excepting the one alleged against the defendant." *Id.* at 319, 14 A.2d at 797. In none of these cases, nor in

---

THE WITNESS: Because he lives in the project.
Q He lived at the project?
A Yes.
Q Have you ever been introduced to his cousin?
THE COURT: Prior to that time?
Q Prior to the—prior to the day of the shooting?
A Yes, once.
Q Once. And would you recognize that person if you saw him, Harold's cousin?
A Yes.
Q Would you look in the courtroom and see if you see him here?
A Yes, he's here.
Q And where is he, please?

A To the right of Sergeant—right there. (Indicating)
Q Is that this person, Mr. Ortiz?
A Yes, sir.
MR. RENALDO: May the record reflect the witness has identified the defendant, Your Honor?
THE COURT: No. The witness identified the defendant that he knew as Harold's cousin."

3. The defendant does not dispute that modern firearms identification (the science of forensic ballistics) is beyond the ordinary knowledge of a jury. Nor does he dispute that Dr. Wilkinson was qualified to render an expert opinion in this field.

the case before us, can it be said that such testimony usurps the jury's function. Rather, such testimony aids the jury in its search for the truth.[4] *Cf. State v. Robertson*, 108 R.I. 656, 278 A.2d 842 (1971) (admission of expert opinion on ultimate issue of criminal insanity does not invade province of jury). We therefore cannot agree with defendant's contention that Dr. Wilkinson's testimony was an encroachment into the province of the jury.

■ The defendant also questions the relevance of Dr. Wilkinson's testimony about the conclusiveness of his test, contending that the probative value of an expert's opinion testimony "does not * * * depend upon the view that the individual witness takes of his own performance, skills or expertise." The defendant acknowledges, however, that the probative value of evidence adduced through the opinion testimony of an expert witness is dependent upon "such factors as * * * the credibility which science itself attributes to the evidence given." We think Dr. Wilkinson's testimony falls within this category. Although made in the context of his own ballistics test, Dr. Wilkinson's testimony expressed the degree of credibility or validity that ballistics experts in general attribute to the method he used, not his view "of his own performance, skills or expertise." This testimony was therefore probative of a material issue, *viz.*, the weight to be accorded Dr. Wilkinson's opinion concerning the identification of the murder weapon. A trial justice exercises wide discretion in determining the admissibility of an expert's opinion testimony. We cannot say that the trial justice in the instant case abused that discretion.

## VI

In his last assignment of error defendant challenges the procedure used by the trial justice in submitting defendant's confessions to the jury as part of the evidence to consider in its deliberations.

■ Our procedure governing the admissibility of inculpatory statements allegedly obtained in violation of a defendant's constitutional guarantees is well settled. In determining whether to admit such evidence, the trial justice must first conduct a preliminary hearing out of the jury's presence in which the state must show by clear and convincing evidence that the statements were obtained in a constitutional manner. And second, if the trial justice admits the evidence, he must specifically instruct the jury that before it may consider the evidence, it must first determine beyond any reasonable doubt that the inculpatory statements were not obtained in violation of the defendant's constitutional guarantees. Thereafter, the inculpatory statements may be submitted to the jury. *State v. Espinosa, supra; State v. Leavitt, supra.*

■ The defendant, relying on *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), and *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), argues that his confessions should not have been submitted to the jury until it had determined (and such was indicated to the court) that the confessions had been obtained without violation of defendant's constitutional guarantees. We think defendant's contention evinces an erroneous reading of *Jackson* and *Lego*.

In *Jackson*, the Court held that a defendant has a constitutional right at some stage in the proceedings to object to the use of an allegedly coerced confession and to have a fair hearing in a proceeding separate and apart from the jury trying guilt or innocence in order to insure a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession. The Court, in the course of its opinion, however, approved procedures such as ours:

---

4. The defendant does not dispute that the jury was properly instructed about the significance of Dr. Wilkinson's opinion. Moreover, defendant, on cross-examination, remained free to inquire into "the qualifications, skills or knowledge of the witness or the accuracy or value of his opinion, or the methods by which he arrived at or the data upon which he based his conclusion." *State v. Kozukonis*, 100 R.I. 298, 303, 214 A.2d 893, 897 (1965).

"We raise no question here concerning the Massachusetts procedure. In jurisdictions following this rule, the judge hears the confession evidence, himself resolves evidentiary conflicts and gives his own answer to the coercion issue, rejecting confessions he deems involuntary and admitting only those he believes voluntary. It is only the latter confessions that are heard by the jury, which may then, under this procedure, disagree with the judge, find the confession involuntary and ignore it. Given the integrity of the preliminary proceedings before the judge, the Massachusetts procedure does not, in our opinion, pose hazards to the rights of a defendant." *Jackson v. Denno*, 378 U.S. at 378 n. 8, 84 S.Ct. at 1781 n. 8, 12 L.Ed.2d at 916 n. 8.

And in *Lego*, the Court rejected "petitioner's final contention that, even though the trial judge ruled on his coercion claim, he was entitled to have the jury decide the claim anew." *Lego v. Twomey*, 404 U.S. at 489, 92 S.Ct. at 627, 30 L.Ed.2d at 627. Thus, neither *Jackson* nor *Lego* supports the defendant's contention that a jury determination of the constitutionality of the manner whereby his confessions were obtained must be made a matter of record before such evidence may be submitted to the jury.[5]

The defendant's appeal is denied and dismissed, the judgments of conviction are affirmed, and the case is remanded to the Superior Court.

---

5. We are aware that in light of *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), and *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), several jurisdictions have reexamined and reevaluated the role of the jury in the determination of a defendant's coercion claim. *E. g., State v. Collins*, 297 A.2d 620, 630–636 (Me.1972). *See generally* 3 Wigmore, *Evidence* § 861 at 570–93 (Chadbourn rev. 1970). The defendant, however, did not raise this issue below.