STATE

v.

**William M. IOVINO.**

No. 85–532–C.A.

Supreme Court of Rhode Island.

April 15, 1987.

James E. O'Neil, Atty. Gen., Joel S. Chase, Thomas Dickinson, Sp. Asst. Attys. Gen., for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Asst. Public Defender, for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on appeal by the defendant from judgments entered in the Superior Court convicting the defendant of second-degree murder and assault with intent to murder. A motion for new trial was denied, and the defendant was sentenced to fifty years imprisonment on the murder charge, of which ten years

were suspended, and to twenty consecutive years of imprisonment on the charge of assault with intent to murder, of which ten were suspended. We sustain the appeal in part. The facts of the case are as follows.

On June 1, 1983, just after 1 a.m., a fusillade of shots were fired into the walls and interior of the West Warwick police station. Thomas Culter, a truck driver, was standing at the front counter of the police station when he was killed as a result of one or more of five bullets that entered his body. Police Officers Nicholas Pellegrino and Raymond Caron were in different parts of the station but alleged to be in such physical proximity to the path of the bullets as to be in immediate danger of being struck, although neither was, in fact, hit by a bullet. Subsequent to this gunfire either nineteen or twenty bullet holes were found inside the station, in the outside walls, and in the walls of a town office that shared the building.

Immediately after the shooting, a fireman reported that he saw a silver-gray Ford Ranchero speeding down Main Street in West Warwick. After a description of the vehicle was broadcast, a Coventry policeman, Richard B. Schmitter, stated that he saw a vehicle fitting the description proceeding on Route 117 in Coventry. He broadcast over his patrol-car radio the license plate of the vehicle, which read "IOVINO." Following a chase, another Coventry police officer, Mark Turco, pulled the vehicle over to the side of the road in West Greenwich, just beyond the Coventry line. He testified that during the chase he noted an object, which was later found to be a shoulder holster, being thrown from the car. Other witnesses testified that they found guns and ammunition on the side of the road over the route followed in the Turco chase.

Evidence adduced at trial indicated that the silver-colored Ford Ranchero with license plate IOVINO was registered to defendant. It was further shown that a Ruger mini-14 rifle found by the roadside had been purchased from a shooting-supplies store by William M. Iovino. Evidence was presented by Dr. Richard Wilkinson of the University of Rhode Island Crime Lab that nineteen casings found at the scene of the shooting had come from the Ruger mini-14 rifle found by the police. After stopping the Ford, Officer Turco noted a clip and spent shell casings from a Ruger mini-14 rifle within the car in plain view.

Although defendant stated to the police that he had been at the Sun Valley Inn in East Greenwich until one o'clock on the morning of June 1, 1983, the owner and barmaid both testified that they knew defendant and that he had left the establishment between 12 and 12:30 a.m. since they had closed early because business was slow. The distance from the Sun Valley Inn to the West Warwick police station was approximately seven miles, according to testimony.

The defendant raises four issues in support of his appeal. We shall consider two of these issues in the order in which they have been raised in defendant's brief and will supply such additional facts as may be required in order to consider each issue.

## I

DID THE TRIAL JUSTICE VIOLATE THE BAN ON DOUBLE JEOPARDY CONTAINED IN THE CONSTITUTION OF THE UNITED STATES AND THE CONSTITUTION OF THE STATE OF RHODE ISLAND BY REINSTATING THE CHARGES OF SECOND-DEGREE MURDER AND ASSAULT WITH INTENT TO MURDER ONE DAY AFTER HE GRANTED A JUDGMENT OF ACQUITTAL ON THOSE CHARGES AND AFTER DEFENDANT HAD RESTED HIS CASE?

At the close of the evidence adduced by the prosecution, defense counsel moved for judgment of acquittal on all three charges that had been presented. The court ruled in response to this motion that the state had failed to produce evidence that defendant had intended to kill the victim or anyone else by firing the volley of shots into the West Warwick police station. As a result, he granted the motion to acquit in regard to first- or second-degree murder but determined that the case would contin-

ue in respect to the charge of manslaughter. He further reduced the assault with intent to murder charges to assault with a dangerous weapon.

Thereafter, the defense presented a witness, Joseph Perry, who had been on Main Street at the time of the shooting. He stated that he first saw a dark-colored car come around the bend and then heard shots and saw red flashes. He stated that he believed the car was a Buick Skylark, definitely not a truck type of vehicle like a Ranchero. The defense also presented two police officers who had taken part in Dr. Wilkinson's neutron-absorption test on defendant's T-shirt and gloves, the results of which were negative. They testified that the items tested had been, at all relevant times, in police custody.

After purporting to grant the motion for judgment of acquittal under Rule 29 of the Rules of Criminal Procedure of the Superior Court, the trial justice did not mention the motion or the ruling thereon to the jurors. The defendant's case was presented without any indication to the jury that the charges had been modified or reduced in any way.

The next morning, counsel for the prosecution asked to reargue the question of the propriety of the trial justice's ruling on the motion for judgment of acquittal. It was suggested by the prosecutor that there was still an opportunity to reconsider before the jury became aware of the court's determination. After hearing argument on both sides, including arguments relating to double jeopardy, the trial justice, considering this court's decision in *In re Leon*, 122 R.I. 548, 410 A.2d 121 (1980), determined that since the homicide had been committed in the course of an inherently dangerous felony, sufficient evidence had been presented to establish the charge of second-degree murder and the charge of assault with intent to murder Officer Pellegrino. In respect to the charge of assault with intent to murder Officer Caron, the trial justice reduced the charge to simple assault. The jury ultimately convicted defendant of second-degree murder and assault with intent to murder Officer Pellegrino and found defendant not guilty of assaulting Officer Caron.

■ Not only was the trial justice correct in determining that defendant had committed the homicide and assault in the course of the commission of an inherently dangerous felony as outlined in *In re Leon* but moreover the evidence abundantly showed that defendant's conduct in firing a volley of shots into a building that he had every reason to believe was occupied by human beings amounted to wanton recklessness. It has long been well settled in this and other jurisdictions that wanton recklessness can supply the element of malice that is necessary to raise homicide to the level of common-law murder. *See, e.g., State v. McGranahan,* 415 A.2d 1298 (R.I. 1980); *Commonwealth v. Coleman,* 455 Pa. 508, 318 A.2d 716 (1974); Perkins & Boyce, *Criminal Law,* 59–60 (3d Ed.1982). A similar analysis would lead to the conclusion that wanton recklessness would supply the element of intent necessary to the charge of assault with intent to murder.

■ The defendant does not contend that the evidence before the trial justice at the time of the close of the state's evidence was insufficient to establish the crime of second-degree murder but argues that regardless of the correctness or incorrectness of the original determination of the trial justice, principles of double jeopardy mandate that the decision, once made, could not be reconsidered. There is no question that in recent years the Supreme Court of the United States has decided a plethora of double-jeopardy cases, many of them on the issue of the right of the government to appeal, which have refined, often with subtle distinctions, the federal double-jeopardy doctrine. *See, e.g., United States v. Scott,* 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978); *United States v. Martin Linen Supply Co.,* 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977); *United States v. Wilson,* 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975).

In *Martin Linen Supply Co.,* Justice Brennan, writing for the Court, established some general principles that would apply beyond the facts of that particular case to

the question of when double-jeopardy provisions will bar proceeding with a trial. In respect to the central purpose of the policy on double jeopardy he observed, "The development of the Double Jeopardy Clause from its common-law origins * * * suggests that it was directed at the threat of multiple prosecutions, not at Government appeals, at least where those appeals would not require a new trial." 430 U.S. at 568–69, 97 S.Ct. at 1353, 51 L.Ed.2d at 649 (quoting *United States v. Wilson*, 420 U.S. at 342, 95 S.Ct. at 1021, 43 L.Ed.2d at 241). He went on to suggest that the double-jeopardy clause guarantees that the state shall not be permitted to make repeated attempts to convict the accused but that when a prosecution appeal presents no threat of successive prosecutions, the double-jeopardy clause is not offended. *Id.* 430 U.S. at 569–70, 97 S.Ct. at 1354, 51 L.Ed.2d at 650. The Court further observed that a judgment of acquittal even made after the jury had failed to reach a verdict could not be appealed by the government. It is significant in the foregoing case that the judgment of acquittal completely terminated the prosecution's case and the trial judge held that the evidence of contempt, which was the only charge before the court, was " 'the weakest [contempt case that] I've ever seen.' " *Id.* at 572, 97 S.Ct. at 1355, 51 L.Ed.2d at 651.

In contrast, in the case at bar the purported granting of the motion for judgment of acquittal on the murder and assault with intent to murder charges did not purport to terminate the prosecution's case and take the matter from the jury in its entirety; rather it only had the effect of reducing certain charges. It is significant that this reduction of charges was never communicated to the jury.

In effect the motion for judgment of acquittal in this case was the functional equivalent of a request for peremptory instruction removing certain charges in the indictment from the jury's consideration. This is not unlike the situation in *Lee v. United States*, 432 U.S. 23, 97 S.Ct. 2141, 53 L.Ed.2d 80 (1977), wherein the Supreme Court held that a motion to dismiss the indictment, which had taken place within

the trial after the close of the government's case, was "functionally indistinguishable from a declaration of mistrial." *Id.* at 31, 97 S.Ct. at 2146, 53 L.Ed.2d at 87. This is illustrative of the proposition that a procedural request may not be entirely controlled by the label that a proponent ascribes to it.

Although the trial justice responded to a motion made pursuant to Rule 29, the same result could have been achieved by a request for peremptory instruction to the jury made just prior to the trial justice's charge.

The nub of the distinction between this case and *Martin Linen Supply Co.*, lies in the facts that the reconsideration in this case had no effect on the continuance of the trial in which it was made, that the jury remained impaneled to adjudicate lesser included charges, and that defendant was not faced with any threat of reprosecution beyond the jury already assembled to hear his case. The closest precedent to the instant case is *People v. District Court*, 663 P.2d 616 (Colo.1983).

In that case the defendant was charged with sexual assault in the first degree, first-degree burglary, and the commission of a crime of violence, all of which had taken place on October 18, 1981. Jury trial began April 27, 1982. At the conclusion of the state's case, the defendant's motion to acquit was granted in regard to the greater offenses of sexual assault in the first degree and first-degree burglary, as well as to an alleged crime of violence. The court ruled, however, that the lesser included offenses of sexual assault in the second degree and second-degree burglary would be submitted to the jury. The court then recessed for the day, ordering the trial to be resumed the next day at 10 a.m. When the parties assembled to resume trial on the following morning, the trial judge ruled orally that he had been mistaken in granting the defendant's motion for judgment of acquittal on the charge of sexual assault in the first degree. The trial court went on to elaborate that it had labored under the misapprehension that the use of a deadly weapon was a necessary element of sexual

assault. Over the defendant's objection to the corrective ruling, the case was submitted to the jury on the charges of sexual assault in the first degree and second-degree burglary. The jury returned guilty verdicts later the same day. Thereafter, the trial judge granted a motion for new trial for cumulative error. Before the new trial began, the defendant moved to dismiss the charge of sexual assault in the first degree on double jeopardy grounds by reason of the fact that the prior judgment of acquittal represented a final judgment that could not be set aside even within the original proceeding. A trial judge granted the motion.

On appeal the Supreme Court of Colorado, after considering all the relevant cases decided in recent years by the United States Supreme Court, determined that the midtrial correction of the District Court's erroneous ruling on a motion for judgment of acquittal did not impair the primary interest that the double-jeopardy clause seeks to accommodate, namely, the elimination of the threat of multiple trials for the same offense. The court explained:

> "Since the court's erroneous judgment of acquittal went only to the greater inclusive charges of sexual assault in the first degree and first degree burglary, the court's midtrial correction of its prior error had no effect whatever on the continuation of the trial. The corrective ruling in other words, did not result in any additional governmental attempt to convict [defendant] before a different jury or undermine in the least [defendant's] interest in having his trial completed by the particular jury impaneled and sworn to resolve the controversy. And finally, there is no indication that the court's erroneous ruling detrimentally affected [defendant's] defense to the charges. An accused under these circumstances has no 'legitimate claim to benefit from an error of law when that error could be corrected without subjecting him to a second trial before a second trier of fact.'" *People v. District Court,* 663 P.2d at 621 (quoting *United States v. Wilson,* 420 U.S. at 345, 95 S.Ct. at 1023, 43 L.Ed.2d at 242–43).

We must consider whether the entry of this abortive order reducing defendant's charges in the case at bar affected the presentation of his defense. There is no question that the three witnesses he presented after the trial court's ruling tended to show he was guilty of no crime at all as opposed to addressing the issue of his guilt on the greater charges that defendant thought to have been reduced. However, it is contended by the state and not contested by defendant that following the correction of his original ruling the trial justice offered defendant an opportunity to present any additional testimony or evidence which he might desire in opposition to the restored greater offenses. The defendant did not avail himself of this opportunity.

It must therefore be concluded that the corrected ruling by the trial justice did not in any way inhibit defendant's presentation of any evidence that he might have chosen to adduce in respect to the greater as well as the lesser included offenses.

Consequently, we are of the opinion that double-jeopardy principles did not bar the trial justice from submitting this case to the jury on the charges of murder in the second degree and assault with intent to murder.

## II

DID THE TRIAL JUSTICE ERR IN REFUSING TO SUPPRESS AN EXCULPATORY STATEMENT MADE TO THE WEST WARWICK POLICE IN VIOLATION OF PRINCIPLES SET FORTH IN *EDWARDS V. ARIZONA,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), AND ITS PROGENY?

Shortly after the incident in West Warwick and the firing of the shots, a broadcast was issued to seek the automobile with the license plate reading IOVINO. Officer Mark Turco saw this automobile at 1:18 a.m. and stopped it at 1:20 a.m. The defendant was arrested and taken to the Coventry station. Officer Turco read defendant his *Miranda* warnings both at the scene of the arrest and at the station. The

defendant made no response to the reading of these *Miranda* rights, but he did refuse specifically to sign a waiver-of-rights form. He further requested an opportunity to call his wife and also his attorney. He found no answer at home, and he was unable to obtain a telephone number for his attorney. At this point the Coventry police asked defendant to take a breathalyzer test, and he refused that as well.

At this juncture West Warwick police had come to the Coventry police station. Officer Ira Cook of West Warwick stated that he met with at least three Coventry police officers and spoke to Officer Turco before accompanying defendant in a Coventry cruiser back to the West Warwick station. The defendant was brought to West Warwick at about 2:40 a.m. and was placed in the detention room. At about 3 a.m., defendant was advised of his rights, again by a West Warwick police officer. He did not respond orally to the reading of these admonitions. Lieutenant Cook wrote on the form, "[R]efused to sign it." He later testified that Iovino did not want to discuss the incident, and as a consequence the police left the room and defendant remained alone.

Approximately five minutes later Lieutenant Cook and other police officers returned. When testifying, Lieutenant Cook acknowledged that his purpose was to attempt to conduct an interview. He hoped to obtain some new information. Lieutenant Cook also testified that he confronted defendant with the fact that the victim had now died and the formal charge as a consequence had been modified to murder. He presented defendant with another *Miranda* rights form. The defendant refused to acknowledge the admonitions given and refused to sign either the acknowledgment or the waiver portions of the form. At this point, Lieutenant Cook did not ask Iovino any direct questions. He admitted that he told him that the charge was now murder and that they, the police, were interested in talking about the incident. Lieutenant Cook testified that defendant responded, "I don't know anything about the incident. I wasn't in West Warwick. I was—I believe he said the Sun Valley Inn in East Green-

wich." Thereupon the suspect once again invoked his right to have an attorney present during questioning. Although his statement was not in reply to any specific question, defendant argues that it was a response to the repeated efforts by West Warwick police, as well as by the prior Coventry interrogators, to elicit a response from him even though he had repeatedly invoked his right to remain silent and at least on one prior occasion had invoked his right to counsel.

There is no question that in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court ruled unequivocally that an individual who was subject to custodial interrogation might, at any time prior to or during questioning, invoke his right to counsel or invoke his right to remain silent and that if he did so, the interrogation must immediately cease. The Court went on to say that without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has once been invoked. It is also true that in *Miranda* the Court clearly stated that there was no distinction between an inculpatory or an exculpatory statement for purposes of the application of the prophylactic rule.

A more specific and precise application of this general rule was made in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). In that case police officers sought to interrogate a suspect while he was in custody. He indicated to the officers that he wished to remain silent and also that he desired to obtain the assistance of counsel before any further interrogation. Edwards was then returned to the cell block. The next day two other detectives came to the cell block and indicated that they desired to question him further. Edwards at that point asked the guard who was in charge of the cell block if he was required to talk to those detectives. The guard answered that he was. At this point Edwards was brought into an interrogation room where the detectives gave him *Miranda* warnings again and

proceeded to question him, whereupon he gave an inculpatory, or incriminating, statement. The Court made it very clear that it was the obligation of the police, after Edwards had invoked his right to counsel and his right to remain silent, to honor this election on his part scrupulously. The Court further stated that once a suspect invokes either or both of these rights, the police may not again question him unless he very clearly waives his right, and this waiver may not come unless the suspect initiates further conversation with the police. As the Court expressed it:

> "[W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused * * * having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85, 68 L.Ed.2d at 386.

In *Smith v. Illinois,* 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), a similar factual situation to that of the case at bar was encountered. A police officer in the course of admonishing a robbery suspect of his *Miranda* rights told the suspect that he had a right to consult with an attorney and to have the attorney present during the interrogation. The suspect responded in the affirmative. Undeterred by this request for counsel, the police officer went on to complete the reading of the *Miranda* rights form and asked the suspect if he wished to talk to the officer without a lawyer being present. The officer explained what this decision would mean, and the suspect agreed to talk and made certain incriminatory statements. In a per curiam opinion it was held that the Supreme Court of Illinois was in error in approving the admitting of the incriminatory statements

at trial. The Court reiterated that once a suspect has made a definite request for counsel (as he did in that case) all questioning must cease and his subsequent responses to continued police questions cannot render his earlier request ineffective unless as suggested in *Edwards v. Arizona,* the suspect initiates further conversation. Only then may a waiver, if unequivocally made, be effective.

The thrust of the problem in the case at bar is whether the West Warwick police, after the very definite invocation of the right to remain silent and the right to counsel on the part of Iovino, engaged in conduct that was the equivalent of reinitiating the interrogation. The first element to be considered in this analysis is the responsibility of the West Warwick police to have knowledge of the fact that defendant had previously invoked his right to counsel as well as his right to remain silent when he was in the custody of the Coventry police officers. It has been held in *United States v. Scalf,* 708 F.2d 1540 (10th Cir.1983), that in circumstances in which a suspect has invoked the right to counsel to one group of law enforcement officers, "knowledge of that request is imputed to all law enforcement officers who subsequently deal with the suspect." *Id.* at 1544. In *Scalf* a person suspected by Oklahoma police of a bank robbery was read his rights by the state officers and then requested counsel. No interrogation took place thereafter by state officers. The suspect was then booked at the station, but later he was placed in an interview room and Federal Bureau of Investigation agents interrogated him after admonishing him of his *Miranda* rights. They secured his assent to a waiver-of-rights form and a confession. The Court held that the federal agents were bound by the earlier invocation of the right to counsel in respect to the state officers. Other courts have ruled to the same effect, *see United States v. Porter,* 764 F.2d 1 (1st Cir.1985); *People v. White,* 61 Ill.2d 288, 335 N.E.2d 457 (1975), *cert. denied,* 424 U.S. 970, 96 S.Ct. 1469, 47 L.Ed.2d 738 (1976); *McKeamer v. United States,* 452 A.2d 348 (D.C.App.1982). In

*McKeamer* the police arrested the defendant on a charge of stabbing and admonished her of her *Miranda* rights. She thereupon refused to sign a waiver form and indicated that she did wish to have counsel. Thereafter, she was admonished again and interrogated by detectives in the homicide bureau who did not know of the initial invocation of the right to remain silent and the right to counsel. This second interrogation produced a statement. The Court of Appeals of the District of Columbia held that the earlier invocation of the right to counsel was binding upon subsequent interrogators even if they were unaware of the earlier exchange between the arresting officers and the suspect. *See also Michigan v. Jackson*, 475 U.S. ——, 106 S.Ct. 1404, 1410, 89 L.Ed.2d 631 (1986), in which the Court observed "[o]ne set of state actors * * * may not claim ignorance of defendants' unequivocal request for counsel to another state actor * * *."

 In the case at bar, it is apparent that this suspect was presented with waiver-of-rights forms by both Coventry and West Warwick police and that he refused to sign them and indicated to the Coventry officers that he did not wish to answer questions but rather wished to contact an attorney. Although he was unsuccessful in his attempt to contact an attorney, there is no question that he sought to do so. When he went to the West Warwick station, he was again admonished of his *Miranda* privileges and declined to acknowledge or execute the waiver form. It was only after the third initiation of confrontation by Lieutenant Cook that defendant made a remark, not in answer to a question, but in answer to the importunity that he look at, read, and sign the waiver-of-rights form. It was at this point, at least the third encounter between him and the police officers, that he decided to make a statement. We are of the opinion that the persistent presentation of the waiver-of-rights form to defendant, even though the last form was accompanied by a statement that the charge was now murder as opposed to the lesser charge of assault with intent to murder, constituted conduct that the police should have reasonably anticipa-

ted was designed to elicit a statement of some kind. *See Smith v. Illinois*, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984); *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

This case is to be contrasted with the case of *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), in which police initially interrogated Mosley concerning a crime and scrupulously honored his right to remain silent when he invoked the right. About two hours later other detectives came to question Mosley about a completely different crime, one in no way involving the initial transaction concerning which he had been previously interrogated. At the time of the second interrogation he was again admonished of his *Miranda* rights, decided to waive them, and gave an inculpatory statement. Under the unusual facts of that case the Court held that there had been no violation of the *Miranda* prophylactic rules, in marked contrast to the present case in which the police persistently presented Iovino with waiver forms and requests that he answer questions even though he had on at least two prior occasions declined to do so and on one prior occasion had invoked his right to counsel.

We are therefore of the opinion that in this case there was a violation of the bright-line *Edwards* principle, and as a consequence the trial justice was in error in admitting the exculpatory statement, which was then used to the prejudice of the defendant during the course of the trial.

For the reasons stated, the defendant's appeal is denied in part and sustained in part. The appeal is denied in regard to the double-jeopardy grounds but sustained in respect to the denial of his motion to suppress. The judgment of conviction is hereby vacated, and the papers in the case are remanded to the Superior Court with directions to grant to the defendant a new trial on the charges of murder in the second degree and assault with intent to murder.