**STATE**

v.

**Robert PEABODY.**

**No. 91–195–C.A.**

Supreme Court of Rhode Island.

June 16, 1992.

James E. O'Neil, Atty. Gen., Jane McSoley, Jeffrey Greer, Asst. Attys. Gen., for plaintiff.

Richard Casparian, Public Defender, Barbara Hurst, Paula Rosin, Asst. Public Defenders, for defendant.

## OPINION

KELLEHER, Justice.

In the fall of 1988 a Newport County grand jury returned an indictment that charged the defendant, Robert Peabody (Peabody), with the murder of William Capuano (Capuano). After a two-week trial, the case was submitted to a jury on June 27, 1990. The following day the jury returned a verdict of guilty to a charge of first-degree murder. Peabody is now before us on appeal whereby he alleges that the trial justice committed several errors of law.

In considering this appeal, we encounter a novel situation in this jurisdiction. Peabody claims that he presently suffers from amnesia and cannot remember the period surrounding Capuano's death. The thrust of Peabody's appeal is that his amnesia renders him incompetent to stand trial because he cannot assist counsel by recollecting the timeframe during which he stands accused of murdering Capuano. The state's case against Peabody consists largely of circumstantial evidence, including testimony from those people who were in contact with Peabody at a time when he apparently was not suffering from amnesia. Therefore, a detailed summary of the facts is necessary to set forth the issues that arise from this controversy.

Peabody and Capuano resided in a Newport rooming house that was owned by Darla Gipson (Gipson). Peabody had lived there from September 1987 and Capuano since August 1987. Their rooms faced directly across from each other on the second floor. During the time surrounding Capuano's murder, they were the only two residents in the house. Gipson left Newport for a week, beginning May 18, 1988. Upon her return home late in the evening of May 25, she found the house in total darkness. Gipson testified at trial that she went upstairs and checked for Capuano but that he was absent. She further related that both Peabody and Capuano were nowhere to be found the following morning.

Earlier on May 25, 1988, Capuano's sister, Elizabeth Falderbaum (Falderbaum), had reported her brother missing to the Newport police. She testified that Capuano had been tutoring her in math and that she had been in daily contact with him until May 21, 1988, when she was unable to reach him by telephone. Falderbaum testified that she made several unsuccessful attempts to contact Capuano by phone from May 21 to May 25. She stated that for a few of these calls a male responded and told her that Capuano had gone off to work. Falderbaum told the jury that on one of these occasions, the person identified himself as Peabody. She recognized his voice as belonging to the same person who answered her other calls.

Another person who became concerned over Capuano's absence was James Foley (Foley). Foley had worked with Capuano for a Newport vacation resort called the INN Group.[1] Foley testified that he last saw Capuano at work on May 20, 1988. Foley thought it odd that Capuano did not show up for work on the morning of May 21 because Capuano appeared to be experiencing financial difficulties and his first paycheck was due on that day. Foley stopped by the rooming house on May 21 and 22 but received no response. He again visited the house in the late afternoon of

1. The INN Group has been described as a limited partnership that operates both an individual room-rental business and a time-share business at the Inn on the Harbor.

Monday, May 23. On this visit Peabody opened the door and informed Foley that he had not seen Capuano. Foley testified that when he expressed his concern regarding Capuano's disappearance, Peabody told him there was no cause for alarm as Capuano had, on other occasions, gone off for a number of days without notifying anyone. Foley further related that during this exchange, Peabody was blocking the entrance and, without actually pushing him, he used his body to move Foley away from the house.

Another fellow worker, Gary Barr (Barr), testified that at approximately 7 p.m. on Friday, May 20, he received a call from Capuano inviting him to come over to the rooming house for a few beers. Barr declined because his car was in disrepair. Barr testified that Capuano seemed excited about receiving his first paycheck from the INN Group on the following day. Barr said he, too, was puzzled when Capuano failed to appear at work on Saturday morning, May 21. Barr testified that when he arrived home that evening he attempted to contact Capuano by telephone. After receiving a busy signal on numerous occasions, Barr proceeded to the rooming house and upon his arrival was greeted by Peabody. Barr recalled picking up a phone in the foyer and failed to hear a dial tone. Peabody then went into the kitchen and informed Barr that the phone was plugged in. At that time Barr picked up the receiver and heard a dial tone. In response to inquiries about Capuano, Peabody told Barr he had last seen him leaving for work that morning.

Barr persisted in his attempts to contact Capuano over the next week but was unsuccessful. On May 27, 1988, Gipson informed Barr that she was going to clean out Capuano's room so that it could be rented to someone else. Barr went to the house to retrieve some belongings he had lent Capuano. While gathering his belongings, Barr noticed Capuano's "pitch book," a selling manual employed by sales representatives of the INN Group. Barr testified that because the pitch book contained information that was vital for selling, its presence led him to surmise that when Capuano last left his room, he had not intended to go to work. Barr also testified that while in the rooming house he smelled a foul odor that seemed to emanate from Peabody's room. Barr and Gipson entered Peabody's room and checked under the bed for rotten food but discovered none.

According to the testimony elicited at trial, the last person to see Peabody in Newport was Robert Hendrickson (Hendrickson), a neighbor who did minor maintenance work for Gipson. On Tuesday, May 24, 1988, the day before Gipson's return to Newport, Hendrickson arrived at the rooming house to retrieve a lawn mower that was stored in the basement. Hendrickson testified that Peabody approached him as he was locking the basement door and asked him what he was doing. Hendrickson told the jury that two days after this encounter, on Thursday, May 26, when driving across the Sakonnet Bridge toward Fall River, Massachusetts, he saw Peabody on foot proceeding in the same direction.

On Tuesday, May 31, 1988, Gipson began to clean out Peabody's room. (Peabody was in arrears in rent, and Gipson had not seen him since before she left Newport on May 21.) Gipson removed a plaid flannel cover from a chair in Peabody's room and discovered a layer of plastic underneath. When she removed the plastic, she observed that the back of the chair was covered by a large brownish stain that gave off a rancid odor. On the floor near the foot of the bed Gipson came upon a long "package" wrapped in what appeared to be a carpet. Gipson stated that she sensed there was a body inside the carpet and immediately ·notified the police.

Sergeant John Sperling and Inspector Eugene Sullivan (Inspector Sullivan) of the Newport police responded to the scene and were directed to Peabody's room by Gipson. When the officers unrolled the carpet, they discovered a body wrapped in towels and plastic trash bags. From Peabody's room police seized two .22–caliber shell casings, a box of plastic trash bags identical to the ones used to wrap the body, and a variety of other items.

Doctor William Sturner (Dr. Sturner), chief medical examiner for the State of Rhode Island, later determined that the body, identified as that of Capuano, had suffered four gunshot wounds—two to the chest area and two to the head. Doctor Sturner postulated that the state of decomposition led him to believe that Capuano had died "sometime in the early twenties of May."

In the first week of June 1988, several individuals supplied the police with further information about the case. A former housemate of Peabody's told police that Peabody had called him sometime in early May 1988 and asked if he wanted to purchase a .22–caliber handgun. Two of Peabody's coworkers at Quikley's Restaurant in Middletown offered information to the police regarding a conversation at the restaurant concerning the murder of a woman whose body was discovered in a Warwick hotel. One of Peabody's coworkers testified that Peabody had remarked earlier that "the best way to dispose of a body was to put it in a bag, wrap it in a sheet or something so it wouldn't smell." Another coworker recalled that Peabody had said he would not leave a body exposed but would "do something * * * to cover up the smell."

The owner of a liquor store located next to Gipson's rooming house informed police that Capuano had come into the store during the early evening of Saturday, May 21. He was quite certain of the date because he worked alternate Saturdays at the store and specifically remembered working on May 21. An employee of the same store also testified that he spoke with Capuano in the store on Saturday, May 21, 1988.

In the meantime, a seemingly unrelated scenario was unfolding in Massachusetts. On May 30, 1988—the day before Capuano's body was found—a man identifying himself as Robert Anderson or Christopher Anderson was discovered by the roadside near the Bourne Bridge in a semiconscious state. He had a number of slash marks on his left forearm indicative of what was believed to be a suicide attempt. Anderson was transported to Tobey Hospital in New Bedford where he underwent neurological testing. On June 7, 1988, he was admitted to the New Bedford Crisis Center (crisis center) where he was placed under the care of Dr. Alan Gordon (Dr. Gordon), a board-certified psychiatrist.

Doctor Gordon determined that the man known to him as Anderson was suffering from a dense retrograde amnesia, exhibiting almost a complete loss of memory for past events, although his memory for present circumstances seemed intact. Anderson claimed he had been working in Vermont and had been driving from Vermont to Massachusetts with an individual named Larry Nissen.

For two weeks the crisis center assisted Anderson in a full-scale national search to discover his identity. Doctor Gordon testified that Anderson was cooperative in the search to discover his identity. Anderson submitted to fingerprinting, consented to FBI clearance, and cooperated with a national search in the newspapers. A photo of Anderson and an accompanying article about his attempts to discover his identity appeared in print on June 18, 1988. Four days later, on June 22, Newport and New Bedford police went to the crisis center to speak with Anderson, whom they believed to be Peabody. Police identified Anderson as Peabody and placed him under arrest for the murder of Capuano. Peabody waived extradition and voluntarily returned to Newport with the police. Such other facts as may be helpful to the discussion shall be recounted below.

Prior to trial a hearing was held to determine Peabody's competency to stand trial pursuant to this court's pronouncement in *State v. Cook*, 104 R.I. 442, 244 A.2d 833 (1968). In *Cook* this court stated:

"[I]n order for a court to permit a defendant to be tried three things must be found: first, that defendant understands the nature of the charges brought against him; second, that defendant appreciates the purpose and object of the trial proceedings based thereon; and third, that defendant has the mental capacity to assist reasonably and rationally his counsel in preparing and putting

forth a defense to the criminal charges of which he stands accused. * * * If the answer to all three of the preceding tests is affirmative, then the defendant is mentally capable for purposes of a trial and should be given a timely opportunity to proceed to a trial. When a trial justice in this state has presided over a hearing of this nature and rendered a decision on the defendant's fitness for trial in compliance with the relevant law on competency set out above, his decision is entitled to great weight and will not be disturbed by us unless it is shown that he clearly abused his discretion in making [that] determination." *Id.* at 447–48, 244 A.2d at 835–36.

At this hearing the defense claimed that Peabody's inability to remember events surrounding the time of Capuano's murder rendered him incapable of assisting counsel in the manner required by G.L.1956 (1990 Reenactment) § 40.1–5.3–3(a), which reads in pertinent part:

"(2) 'Competent' or 'competency' means mental ability to stand trial. A person is mentally competent to stand trial if he or she is able to understand the character and consequences of the proceedings against him or her and is able properly to assist in his or her defense;

"(3) 'Incompetent' or 'incompetency' means mentally incompetent to stand trial. A person is mentally incompetent to stand trial if he or she is unable to understand the character and consequences of the proceedings against him or her or is unable properly to assist in his or her defense."

In support of his position, Peabody presented three medical experts who had personally examined him or had reviewed the medical and investigative reports of others who had examined him.

At the competency hearing, the defense presented Dr. Mary Elizabeth Leimkuhler (Dr. Leimkuhler), a clinical neuropsychologist, who performed a neuropsychological examination of Peabody on three occasions in May and June of 1989. Doctor Leimkuhler also performed a number of tests to measure Peabody's memory, the results of which tests indicated that Peabody's memory was not functioning normally. Doctor Leimkuhler testified that Peabody told her that he remembered few details of his life before 1988, though he was beginning to get a sense of this period through information provided by family members.

Doctor Leimkuhler believed that much of the information provided to her by Peabody was "confabulatory," meaning the making up of data to fill in blanks in the memory, a characteristic consistent with memory disturbance. Doctor Leimkuhler compared confabulation with malingering, which she defined as conscious lying with intent to deceive. Although Peabody exhibited deficiencies in his personal memory, she testified that he retained a normal memory for world events that had taken place in his lifetime. Doctor Leimkuhler concluded that Peabody suffered from a memory disorder that "may well" have had some neurological basis.

The defense's second expert, Dr. Gordon, the psychiatrist who was in charge of Peabody's treatment at the crisis center, testified that Peabody appeared to be suffering from dense amnesia in terms of past events while appearing to be alert and oriented in terms of present events. While unable to rule out the possibility that Peabody was faking his condition, Dr. Gordon stated that "the most likely possibility" was that Peabody was not malingering. It was Dr. Gordon's "impression" that Peabody was suffering from the involuntary repression of memories consistent with a "psychogenic fugue," which he defined as loss of memory in one experiencing some significant psychological trauma. In contradiction of Dr. Leimkuhler's belief, Dr. Gordon stated that no neurological deficit or disorder was the cause of Peabody's amnesic state.

Doctor Kurt Daffner (Dr. Daffner) was the final expert to testify for the defense. A behavioral neurologist with specialized knowledge in the brain/central nervous system and behavior, Dr. Daffner conducted a neurological examination of Peabody that suggested brain abnormalities that could have implications regarding Peabody's memory problems. Doctor Daffner

also concluded that Peabody was not malingering and that his memory problem resulted from both neurological and psychological causes.

The state's expert witness, Dr. Ronald Stewart (Dr. Stewart), a psychiatrist, conducted an examination of Peabody at the Adult Correctional Institutions in order to determine his competency to stand trial. Doctor Stewart testified that Peabody was alert, well oriented, and cognizant of the proceedings against him. It was the opinion of Dr. Stewart that Peabody was competent to stand trial.

On May 2, 1990, the trial justice issued a bench decision, finding that Peabody had failed to establish by competent medical evidence that he was suffering from amnesia or any type of altered mental state. The trial justice further found that even if Peabody had convinced the court that he was amnesic, his due-process right to a fair trial would be in no way impaired.

■ Whether amnesia renders one incompetent to stand trial is a question of first impression for this court, and therefore, we turn to case law from other jurisdictions for guidance in making our determination.

In *Morrow v. State*, 293 Md. 247, 443 A.2d 108 (1982), the Maryland Court of Appeals dismissed an appeal by the defendant, Morrow, who had been convicted of manslaughter by automobile. Morrow claimed he was unable to recall anything about the incident and was therefore incompetent to stand trial. A psychiatrist testifying on Morrow's behalf told the court that Morrow suffered from genuine amnesia resulting from a severe head injury received in the collision out of which the manslaughter charge arose. While Morrow could understand what was happening at the trial and could consult with counsel, he was unable to supply his lawyer with factual details about the collision. The *Morrow* court found that the trial justice had substantially complied with Maryland's statutory requirement for determining competency. This Maryland competency statute parallels the one set forth in § 40.1–5.3–3 and the standard in *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).[2] In rejecting Morrow's argument that his inability to recall certain factual details precluded the possibility of a fair trial, the *Morrow* court noted that Maryland law requires an understanding of the charge and of the consequences of a conviction and nothing more.

In *State v. Pugh*, 117 N.J.Super. 26, 283 A.2d 537 (1971), the Superior Court of New Jersey stated that even if a defendant did not remember the details of a crime, he would still be competent to stand trial, as amnesia concerning the details of a crime does not bar prosecution. The New Jersey court noted that a contrary rule "would unduly hamper the State's interest in the prosecution of violators of its criminal laws and jeopardize the safety and security of other citizens." *Id.* at 36, 283 A.2d at 542.

Peabody argues that "the *Wilson* test" should be employed by courts in this jurisdiction when considering whether a defendant's amnesia precludes a fair trial. In *Wilson v. United States*, 391 F.2d 460 (D.C.Cir.1968), the defendant, Wilson, suffered from permanent retrograde amnesia caused by the impact in a collision resulting from a police chase.

2. The Maryland competency statute provides in pertinent part:

"Whenever prior to or during the trial, any person charged with the commission of any crime shall appear to the court, or be alleged to be incompetent to stand trial, by the defendant himself, the court shall determine upon testimony and evidence presented on the record whether [ (1) ] such person is unable to understand the nature of the object of the proceedings against him or [ (2) ] to assist in his defense." *Morrow v. State*, 293 Md. 247, 250, 443 A.2d 108, 110 (1982) (quoting Maryland Code (1957, 1979 Repl.Vol., 1981 Cum. Supp.), Article 59, § 23).

The *Dusky* standard may be stated as follows: whether the accused has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him. *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). This standard is similar to the one set forth by G.L.1956 (1990 Reenactment) § 40.1–5.3–3.

The *Wilson* court agreed that amnesia does not per se render an accused incompetent but that the "fair trial" standard of *Dusky* requires a finding that the defendant be "able to perform the functions which 'are essential to the fairness and accuracy of a criminal proceeding.'" *Id.* at 463 (quoting *Pouncey v. United States*, 349 F.2d 699, 701 (D.C.Cir.1965)). A majority in *Wilson* held that whereas the trial justice must determine the issue of competency prior to trial, he or she must also determine after trial whether a defendant received a fair trial. The *Wilson* court identified six areas to consider in determining whether a defendant's amnesia precluded a fair trial:

"(1) The extent to which the amnesia affected the defendant's ability to consult with and assist his lawyer.

"(2) The extent to which the amnesia affected the defendant's ability to testify in his own behalf.

"(3) The extent to which the evidence in suit could be extrinsically reconstructed in view of the defendant's amnesia. Such evidence would include evidence relating to the crime itself as well as any reasonably possible alibi.

"(4) The extent to which the Government assisted the defendant and his counsel in that reconstruction.

"(5) The strength of the prosecution's case. Most important here will be whether the Government's case is such as to negate all reasonable hypotheses of innocence. If there is any substantial possibility that the accused could, but for his amnesia, establish an alibi or other defense, it should be presumed that he would have been able to do so.

"(6) Any other facts and circumstances which would indicate whether or not the defendant had a fair trial." 391 F.2d at 463–64.

Peabody's reliance on *Wilson* is misplaced. The first factor cited by the *Wilson* court, "[t]he extent to which the amnesia affected the defendant's ability to consult with and assist his lawyer," mirrors the same inquiry that the Rhode Island competency statute, § 40.1–5.3–3, requires. We shall not expand the meaning of § 40.1–5.3–3 by holding that a defendant's ability to consult with and assist his lawyer also encompasses the ability to remember the circumstances out of which criminal charges arose.

Inevitably in this jurisdiction and others persons will be charged with crimes for which they have no memory. The causes of their amnesia may vary from psychological or physical trauma to drug or alcohol-induced blackout.[3] *Morrow*, 293 Md. at 254, 443 A.2d at 112. As the Supreme Court of Pennsylvania noted, "For over 100 years, lack of memory in murder cases has been a common and frequent defense. Although the expressions differ, they all amount to the same thing. Cases abound with commonly used statements or testimony by a person accused of murder that 'I don't remember anything'; 'my mind went blank'; 'I blacked out'; 'I panicked and don't remember what I did or anything that happened.'" *Commonwealth v. Price*, 421 Pa. 396, 401, 218 A.2d 758, 760, *cert. denied*, 385 U.S. 869, 87 S.Ct. 136, 17 L.Ed.2d 96 (1966). Our criminal codes have been born of the societal interest in apprehending and punishing those who are guilty of serious crimes. We do not wish to provide a means of evading trial to those who are charged with criminal activity but cannot recall such activity owing to fortuitous circumstances or otherwise. If the Legislature wishes to expand upon the requirements of § 40.1–5.3–3, that is its prerogative.

The third and fourth factors of the *Wilson* test, which would require the state to aid the defense in reconstructing the evidence, are already adequately ensured by Rule 16 of the Superior Court Rules of

---

**3.** We recognize that a separate body of law has developed regarding the effect of intoxication on responsibility for crime. *See Wilson v. United States*, 391 F.2d 460, 468 (D.C.Cir.1968) (Fahy, J., dissenting). However, this court believes that the principle that intoxication does not absolve one of responsibility for criminal acts is harmonious with the principle that amnesia resulting from criminal conduct or otherwise does not per se render one incompetent to stand trial.

Criminal Procedure. This liberal discovery rule provides the defendant with a mechanism with which to avail himself or herself of relevant evidence that is in the possession, custody, or control of the state. *See State v. Adams*, 481 A.2d 718, 723–24 (R.I. 1984). On the basis of this information and its own investigation, defense counsel may present its own theory of defense in response to the state's reconstruction of the case. To require the state to do anything beyond its Rule 16 obligations would be repugnant to the adversarial underpinnings of our criminal justice system.

The fifth and sixth factors of the *Wilson* test require inquiries into the "strength of the prosecution's case" and "[a]ny other facts and circumstances which would indicate whether or not the defendant had a fair trial." 391 F.2d at 464. We believe that these inquiries simply masquerade as another way of asking whether the state has proved guilt beyond a reasonable doubt. *See id.* at 465 (Leventhal, J., concurring). If a defendant elects a trial by jury, the function of determining guilt is reserved for the jury. Under Rule 29 of the Superior Court Rules of Criminal Procedure, the Superior Court may enter a judgment of acquittal if it finds there is insufficient evidence to sustain a conviction for the offense(s) charged. On a motion for a new trial the trial justice sits as a thirteenth juror and may order a new trial if he or she finds that the state has failed to sustain its burden of proof.[4] *State v. Edwards*, 122 R.I. 228, 236, 405 A.2d 1161, 1165 (1979).

Our rejection of the *Wilson* test stems from the fact that our criminal jurisprudence presently guarantees a fair trial that entails rules of evidence and procedure designed to ensure a workable balance of interests of the defendant, the prosecution, and the court. *See* Comment, *Amnesia, a Case Study in the Limits of Particular Justice*, 71 Yale L.J. 109, 136 (1961). We subscribe to the sentiments expressed by the Arizona Supreme Court that "limited amnesia does not totally incapacitate the

defense and the defendant is free to assist counsel in numerous ways. We believe that a defendant is entitled to a fair trial, but not necessarily to a perfect trial." *State v. McClendon*, 103 Ariz. 105, 109, 437 P.2d 421, 425 (1968).

At Peabody's competency hearing the trial justice appropriately cited *Cook*, quoted the language of § 40.1–5.3–3, and noted the testimony of the state's expert witness, Dr. Stewart, who stated that Peabody had the capability "reasonably and rationally [to] assist" his counsel. Doctor Gordon, a defense witness, indicated that if competency to stand trial was contingent upon Peabody's ability to consult with his attorney with a reasonable degree of rational understanding and to possess a rational and factual understanding of the proceedings against him, then he may be considered competent. It is undisputed that Peabody understood the nature of the proceedings, possessed normal short-term memory, and was able to converse with his attorney. The trial justice fully complied with the mandate of § 40.1–5.3–3 and his ruling that Peabody was competent to stand trial, even if he had amnesia, did not constitute an error of law.

■ Consequently we adopt the approach taken by a number of jurisdictions and hold that amnesia, without more, does not per se render an accused incompetent to stand trial. *See United States v. Swanson*, 572 F.2d 523, 526 (5th Cir.1978); *State v. McClendon*, 103 Ariz. 105, 437 P.2d 421 (1968); *Reagon v. State*, 253 Ind. 143, 251 N.E.2d 829 (1969), *cert. denied*, 397 U.S. 1042, 90 S.Ct. 1364, 25 L.Ed.2d 653 (1970); *State v. Pugh*, 117 N.J.Super. 26, 283 A.2d 537 (1971); *State v. Willard*, 292 N.C. 567, 234 S.E.2d 587 (1977). However we do not adhere to the principle that amnesia may never support a finding of incompetency. Rather we believe the trial courts of this jurisdiction should consider each amnesia case on its own merits pursuant to our holding in *Cook*, which requires a meaning-

---

**4.** A motion for a judgment for acquittal and a motion for a new trial were both denied by the trial justice in the instant controversy. Neither

of these decisions has been challenged on appeal.

ful hearing when a defendant's mental capacity is brought into question. *See Morrow*, 293 Md. at 255, 443 A.2d at 113. It is conceivable that in certain instances a defendant's amnesia could be so severe as to render him or her unable to understand the proceedings and assist his or her counsel at trial. In such a scenario a defendant may well be incompetent within the meaning of § 40.1–5.3–3.

■ In his second issue on appeal, Peabody claims that the finding that he was competent to stand trial tainted the trial justice's instruction to the jury on flight. It is a well-settled practice in this jurisdiction that relevant evidence of flight may be introduced as a circumstance bearing on the question of guilt that may be presented to the jury for its consideration. *State v. Cooke*, 479 A.2d 727, 732 (R.I.1984). In *Cooke* this court outlined the multi-inferential analysis necessary for a jury to employ in deciding whether evidence of flight supports an inference of consciousness of guilt as follows:

"The relevancy of flight as evidence of a defendant's guilt, however, depends on the degree of confidence with which a chain of inferences can be followed: (first inference) something the defendant did led him to flee, (second inference) he fled out of consciousness of guilt, (third inference) his consciousness of guilt derived from consciousness of guilt concerning the crime charged, and (fourth inference) his consciousness of guilt concerning a crime charged reflects actual guilt of the crime charged." *Cooke*, 479 A.2d at 732–33 (citing *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977)).

In the instant controversy the trial justice instructed the jury on flight as follows:

"Also, during the course of this trial evidence of the defendant leaving the area of the crime was introduced which might circumstantially impact upon his possible guilt. The relevance of evidence of flight is to be determined by engaging in the inferential process. These inferences are that something the defendant did caused him to flee out of conscious-

ness of guilt and that guilt derived from the crime charged reflecting actual guilt of the crime charged. The critical factor to consider is not whether the defendant has actual knowledge that he is fleeing from the specific crime charged but rather it is whether the totality of the evidence creates an inference that he had that knowledge. The more immediate in time the flight is to the crime charged, the stronger the inference."

Peabody argues that since he was amnesic at the time he left Newport, his actions constituted "aimless wandering" rather than flight. He further contends that because he had no memory regarding the time-frame surrounding Capuano's death, he could not possibly be conscious of any guilt derived from Capuano's murder. In support of his position, Peabody cites *Cooke*, where this court stated that the lynchpin of flight "is a defendant's knowledge [that] the reason why he is fleeing and that the reason he is fleeing is related to the crime on trial." *Cooke*, 479 A.2d at 733. Because Peabody's amnesia precludes an application of the inferential process that would support an inference of consciousness of guilt that he knew what he was fleeing from, Peabody argues that the jury should not have been instructed on flight.

■ At the competency hearing the trial justice found that the defense experts "testified in equivocating or vacillating terms on important facts * * * there was conflicting and contradictory expert medical testimony * * * [that] falls far short of being sufficiently competent and probative for the court to rely upon it." The trial justice found that the expert testimony presented by the defense was conflicting with respect to the cause, if any, of Peabody's amnesia and that the experts' opinions were couched in terms of possibilities rather than probabilities.

We believe that the trial justice did not abuse his discretion with respect to his findings at the competency hearing. Furthermore we note that the jury was not present at the competency hearing and was unaware of the trial justice's rejection of

the defense's expert testimony. The trial justice appropriately instructed the jurors on the weight they were to give the expert testimony presented at trial, stating that

"if expert testimony from an expert witness is to have any evidentiary value, it must speak in terms of probabilities rather than mere possibilities, keeping in mind, however, that absolute certainty is not required. You may consider and accept all, part or none of an expert's testimony. However, uncontradicted and unimpeached expert testimony may not be arbitrarily disregarded. You must consider its probative force in light of all the evidence and give it the weight to which conclusion it led."

Given this instruction, the jury was free to accept or reject the expert testimony on amnesia presented by the defense. In considering such testimony, the jury was also free to reject the inference that Peabody fled Newport out of consciousness of guilt. That the jury did not do so provides Peabody with no support for his argument. Accordingly we are of the opinion that the trial justice's instruction on flight was proper and in accordance with this court's pronouncement in *Cooke.*

Peabody also argues on appeal that the trial justice erred in denying his motion to suppress statements made to the Newport police during an interview, in violation of his *Miranda* rights. In *State v. Verlaque,* 465 A.2d 207 (R.I.1983), this court outlined as follows the procedure and substantive considerations a trial justice must observe when a defendant challenges the voluntariness of a confession:

"[T]he trial justice must conduct a hearing outside the presence of the jury. The confession is admissible if examination of the totality of the circumstances surrounding the interrogation shows, by clear and convincing evidence, that the defendant voluntarily waived his right to remain silent and have the assistance of counsel. *State v. Benton,* R.I., 413 A.2d 104, 109 (1980); *State v. Espinosa,* 109 R.I. 221, 228, 283 A.2d 465, 468 (1971). If the trial justice admits the confession, he must instruct the jury to make an independent assessment of its voluntari-

ness. *State v. Killay,* R.I., 430 A.2d 418, 421 (1981). When reviewing the admissibility of a confession, this court initially looks at the record to determine if the trial justice adequately and correctly followed the procedural safeguards set forth above. If they were observed, we then proceed to examine the record in the light most favorable to the prevailing party and order reversal only if we conclude that the decision of the trial justice was clearly wrong. *Killay, supra* at 421." 465 A.2d at 209–10.

The trial justice's denial of Peabody's motion to suppress must be supported by the following findings: "(1) that [Peabody] had been informed of his constitutional rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); (2) that he had understood these rights and had knowingly, intelligently, and voluntarily waived them; and (3) that he thereafter made a voluntary statement." 465 A.2d at 210. In order to determine whether the trial justice properly decided the factors mentioned above, a factual background of the interrogation is necessary.

After Peabody was placed under arrest at the crisis center, he was transported to the New Bedford police station. Detective James Ray (Detective Ray) read Peabody his *Miranda* rights and requested that he place his initials on the form next to each item to indicate that he understood the rights enumerated therein. Peabody, who identified himself to police as Robert Anderson or Christopher Anderson, placed the initials C.A. next to each item but refused to sign the rights form.

The following day Peabody waived his extradition rights and was returned to the Newport police station. Peabody was again read his *Miranda* rights and upon request initialed each item on the rights form, using the initials R.P. and signed the name Robert Peabody. Shortly thereafter, at approximately 4:15 p.m., Inspector Sullivan and Detective Gene Bucci (Detective Bucci) initiated an interview with Peabody. During the first phase of the interview Inspector Sullivan questioned Peabody about his true identity and the question of

whether he recalled relations and events from his Newport past. In his witness statement Inspector Sullivan noted that he and Peabody had known each other for approximately thirty years, not on a personal basis but as young men who grew up in the same neighborhood for some time. At six o'clock that evening Peabody's sister arrived at the police station and was allowed to visit with him for an hour and a half. After Peabody's sister departed, Inspector Sullivan informed Peabody of the severity of the allegations and asked him if he wanted to make a statement. Peabody replied by stating, "I need some time to think."

At approximately nine o'clock the same night Peabody's sister returned to the police station with their mother, and the three relatives were left alone for about one hour and fifteen minutes. After Peabody's mother and sister had departed, Inspector Sullivan asked Peabody if he would continue to talk with him and Peabody replied, "Sure, I'm not going anywhere." When asked if he shot Capuano, Peabody stated, "I can't tell you right now—I need some time to think." At 11:30 p.m. Inspector Sullivan again asked Peabody if he would make a formal statement, to which he replied, "Not right now, but perhaps in the morning." Inspector Sullivan then asked Peabody if he would at least tell him where the gun was, to which Peabody replied, "Well, if I give you that, you'll want more." Inspector Sullivan testified that the remainder of the interview consisted of Peabody's inquiring about various aspects of criminal proceedings and in turn Inspector Sullivan's informing him about the function of the grand jury, the Attorney General, and the difference between the varying degrees of homicide. Inspector Sullivan testified that when questioned, Peabody would pause, stare, and think for several moments. The inspector stated that it was his impression that Peabody was being evasive and carefully weighing his responses throughout the entire interview. Toward the end of the interview Peabody asked Inspector Sullivan what he thought a lawyer would advise him to do. Inspector Sullivan testified that his reply to Peabody was that he didn't "think any attorney that [he] knew of would want him to make any kind of statement."

At the conclusion of the interview Peabody was again asked if he wanted to make a statement, to which he responded, "I can't tell you right now—I'll wait until the morning." Shortly thereafter the interview ceased, and Peabody was placed in a cell for the evening.

The following morning, June 24, 1988, Peabody was taken from his cell to the interview room and given breakfast. Inspector Sullivan again inquired whether Peabody was willing to make a formal statement, to which Peabody responded, "No, I think I better wait until I just talk with my sister and attorney." Shortly thereafter Detective Bucci again advised Peabody of his *Miranda* rights. At this time Peabody answered a series of questions acknowledging that he was given his *Miranda* rights the day before and had initialed and signed the rights form. Peabody also acknowledged that he was, in fact, Robert Peabody. His answers were written down by Detective Bucci and later read into evidence at the trial.

Peabody also argues that his *Miranda* right to remain silent was violated by the Newport police. In support of his position Peabody cites *State v. Iovino*, 524 A.2d 556 (R.I.1987). In *Iovino* when the defendant was first given *Miranda* warnings, he said nothing, refused to sign the waiver form, and said he wanted to call his lawyer. This court held that the defendant's failure to respond verbally to the warnings and his refusal to sign the waiver-of-rights form constituted an affirmative invocation of his right to remain silent. Peabody argues that his responses that he "needed time to think" plus his silence in the face of any questions directly concerned with Capuano's death similarly constitute an invocation of the right to remain silent. We believe otherwise.

■ Although *Miranda* clearly provides criminal suspects with the right to remain silent, no caselaw holds that one may selectively choose the manner in which he or she

will be interrogated. However, a person in custody may waive the right to remain silent by indicating a willingness to respond to some questions but not to others. *United States v. Thierman,* 678 F.2d 1331 (9th Cir.1982).

In *State v. Westmoreland,* 314 N.C. 442, 334 S.E.2d 223 (1985), the defendant, like Peabody, did not specifically invoke his right to remain silent but rather chose to answer some questions intermittently while refusing to answer others. The Supreme Court of North Carolina rejected the argument that this constituted an invocation of the right to remain silent, noting that the defendant had "willingly submitted to questioning and made such answers and denials as he deemed prudent." *Id.* at 445, 334 S.E.2d at 225.

In *State v. Jones,* 193 Conn. 70, 475 A.2d 1087 (1984), the defendant agreed to speak with police. On several occasions during the interview when police sought direct admissions of guilt, the defendant responded by stating, "I don't want to answer that right now." *Id.* at 82, 475 A.2d at 1094. At no point did Jones ask to terminate the interview. The Supreme Court of Connecticut refused to hold such a statement as being an invocation of the right to remain silent, noting that the defendant did not refuse to answer any questions at all, only certain questions.

■ In the instant case Peabody initialed and signed two rights forms before he was interviewed on June 23, 1988. Sullivan then related to Peabody the evidence and circumstances that led the Newport police to believe that he was responsible for Capuano's death. Rather than invoke the right to remain silent, Peabody allowed the interview to proceed. Peabody's statements, including "I can't tell you right now," "I need some time to think," and "Sure, I'm not going anywhere," certainly do not rise to an invocation of the right to remain silent.

■ Peabody also claims his *Miranda* right to counsel was violated. This court is certainly mindful of the United States Supreme Court's holding in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), where the Court declared that an invocation of the right to counsel established a "bright-line" prohibition against the reinitiation of interrogation by police until the accused has an opportunity to confer with counsel. *Id.* at 484–85, 101 S.Ct. at 1884–85, 68 L.Ed.2d at 386. However, we also recognize the principle that passing references made to an attorney by a criminal defendant may not be considered an invocation of the right to counsel. *See United States v. Jardina,* 747 F.2d 945, 949 (5th Cir.1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 833 (1985); *Commonwealth v. Pennellatore,* 392 Mass. 382, 467 N.E.2d 820 (1984); *State v. Hale,* 453 N.W.2d 704, 707 (Minn.1990).

In *State v. Shifflett,* 199 Conn. 718, 508 A.2d 748 (1986), the Supreme Court of Connecticut was presented with an appeal in which the defendant argued that he had asserted his right to counsel during interrogation. Like Peabody, Shifflett was discussing his predicament with two Connecticut state troopers. As they discussed the various charges on his NCIC rap sheet, the defendant indicated that he would like to have all charges resolved in the form of a "package deal." He told the troopers that such a "deal" could be arranged with the state's attorney by a lawyer who had represented him in the past. Noting that "not every reference to an attorney during custodial interrogation is an invocation of the right to counsel" and emphasizing the significance of the fact that the defendant did not explicitly condition further discussion on prior consultation, the court found that this statement could not have been viewed by police as a "desire to deal with them further only through counsel." *Id.* at 737–38, 508 A.2d at 758–59.

The Ninth Circuit Court of Appeals considered this issue in *Bruni v. Lewis,* 847 F.2d 561 (9th Cir.1988), *cert. denied,* 489 U.S. 1055, 109 S.Ct. 1319, 103 L.Ed.2d 587 (1989). When arrested, the petitioner in this habeas corpus controversy was asked to answer questions by officials. He initially refused, stating, "Not without my attorney." However, he immediately add-

ed, "Well, ask your questions and I will answer them as I see fit." The Ninth Circuit upheld the District Court's finding that this reply did not constitute an invocation of the right to an attorney.

■ Despite having been given his *Miranda* rights several times following his arrest, Peabody never requested a lawyer on June 23, 1988, but rather indicated his willingness to continue speaking with Inspector Sullivan. We believe that Peabody's asking Inspector Sullivan what a lawyer would advise him to do was not an invocation of the right to counsel but merely an inquiry into tactical options that might be available to him. In fact Inspector Sullivan told Peabody that he knew of no lawyer who would want him to speak to police. Rather than heed this advice, Peabody inquired about certain aspects of criminal procedure.

■ The record indicates that Peabody did invoke his right to counsel on the morning of June 24, 1988, when he was asked by Inspector Sullivan if he would make a formal statement and replied, "No, I think I better wait until I just talk with my sister and attorney." After this invocation Detective Bucci advised Peabody of his *Miranda* rights and conducted an interview with him that was read into evidence at the trial. The statement from this interview refers to Peabody's treatment at the hands of police, the administering of *Miranda* warnings, and Peabody's understanding of his rights. Although we believe that the trial justice erred in not suppressing this statement, we are of the opinion that such error was harmless as no prejudice was caused by its admission at trial. The statement read into evidence contained no incriminating evidence, other than Peabody's acknowledgment of his true identity. The record demonstrates that testimony presented to the jury at various times during the trial had already revealed that Peabody had acknowledged his true identity on other occasions.

For the reasons set forth above, Peabody's appeal is denied and dismissed, the judgment of the Superior Court is af-firmed, and the case is remanded to the Superior Court.